PEOPLE v. WINGEART.

Criminal Law—Armed Robbery—Rape—Insanity.
    Judgment of trial court finding defendant guilty of armed rob-
    bery and rape in nonjury prosecution in which defense of
    insanity was interposed is affirmed.
Souris, J., dissenting.

Appeal from Washtenaw; Breakey, Jr. (James
R.), J. Submitted July 17, 1963. (Calendar No.
34, Docket No. 49,932.) Decided October 10, 1963.

Jerald L. Wingeart, pleading insanity, was con-
victed of robbery armed and rape. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *William F. Ager, Jr.,*
Prosecuting Attorney, and *William F. Delhey,* As-
sistant Prosecuting Attorney, for the people.

*Burke, Burke, Ryan & Roberts (Richard W. Ryan,*
of counsel), for defendant.

Carr, C. J. Informations in 2 criminal cases were
filed against defendant in the circuit court of Wash-
tenaw county, one charging him with the crime of
robbery armed and the other with rape. Both of-

REFERENCES FOR POINTS IN HEADNOTE
5 Am Jur 2d, Appeal and Error § 839.
14 Am Jur, Criminal Law § 119; 15 Am Jur, Criminal Law § 310.
44 Am Jur, Rape § 127.
46 Am Jur, Robbery §§ 61, 62, 64.

fenses were claimed by the people to have been committed within the county on July 9, 1961, and because they arose out of substantially the same factual situation they were tried together. Counsel for defendant filed notice of special defense of insanity. Thereafter defendant filed a written waiver of jury trial in each case. The court then requested that defendant be examined as to his capacity for the purposes of the trial, and an order was entered appointing 2 psychiatrists, residents of the county, to examine defendant. Such examination was held, with the result that defendant was found to be capable of comprehending the nature of the proceedings against him and of being able to assist counsel in a reasonable and rational manner. The cases then proceeded to trial before the circuit judge.

In accordance with the special notice of defense served by defendant's attorney, it was claimed that at the time of the commission of the offenses with which defendant was charged he was insane. Testimony was introduced on behalf of the people with reference to the perpetration of the crimes charged and the conduct of defendant during such commission and thereafter. The testimony relating to such matters was not in dispute. There was no claim that defendant did not indulge in the conduct for which he was prosecuted. In his behalf testimony of relatives and friends, and also psychiatrists, was offered for the purpose of establishing the special defense pleaded.

At the conclusion of the trial the circuit judge filed a written opinion in which he analyzed carefully and at length the testimony received with reference to the issue involved. It was his conclusion that defendant was not insane at the time of the commission of the crimes charged. Accordingly defendant was found guilty in each case and sentences were imposed. Motion for a new trial was made and de-

nied. Defendant has appealed asserting that under the proofs the finding that he was not insane at the time of the alleged robbery armed and rape was erroneous, and that the trial judge was in practical effect bound by the opinions of psychiatrists who testified in defendant's behalf and who expressed opinions supporting the claim of insanity.

As indicated, the facts with reference to the commission of the alleged offenses were not in dispute. Shortly after midnight on July 9, 1961, the victim of the robbery, William Morrison, then 19 years of age, and the victim of the rape left the home of a friend where they had visited. The young woman was blind. While parked beside the highway Morrison noticed a car with a bent headlight slow down as it passed. Approximately 3 minutes later, according to the testimony, the car came back, pulled up in front of Morrison's car, within 2 or 3 feet, and defendant got out with a gun in his hand. He ordered Morrison and his companion to get out of their car, stating at the time that he had a gun. The order was obeyed. Thereupon Morrison was ordered to lie down on the ground, and when he hesitated the gun was discharged. The direction given was then complied with, and defendant tossed a piece of rope on the ground and ordered Morrison's companion to tie him up. This she was unable to accomplish and defendant himself proceeded to tie Morrison's arms behind his back and also to tie his lower limbs. The young woman was then forced to lie down and her hands were tied behind her back. Defendant then inquired of Morrison where his wallet was, was told, and it was taken from the victim's pocket. According to the testimony defendant inquired how much gasoline Morrison had in his car, and when he was told that the gasoline tank was nearly full he expressed satisfaction.

Having tied his victims, defendant then proceeded to drive his own car beside the road and move the Morrison car around to enable him to transfer articles from his own car to that of Morrison. Having accomplished this operation he got in and drove the Morrison car a short distance down the highway, then backed up to a position right behind his victims. He picked up the young woman, who was screaming, threw her into the car, and then drove away.

Morrison managed to free himself from the rope with which he had been tied and went to the car that defendant had left, with the idea of using it in going for help. However, there was no key in the ignition and Morrison ran down the road to a house where he was admitted and from which he called the sheriff's department. In a short time 2 police officers from the sheriff's department came, and then 2 State police troopers. Morrison explained what had happened.

While the officers and Morrison were at the scene the latter saw a car approach and stop about 100 feet away. He recognized it as his automobile, and so informed the officers. However the automobile backed up rapidly, turned around, and, before the officers could overtake it, it had disappeared from sight.

After defendant drove away with the young woman in his car, leaving Morrison tied and lying on the ground, he went for some distance. During this time he impressed on the young woman that he had guns, pushing one against her person and telling her that he had 2 more like it. She asked him to drive her to the hospital where she was employed, but instead of that he stopped beside a gravel road where he tried to commit the crime of rape in the automobile. During this proceeding cars passed from time to time, and each time defendant shut the door of the car in which he was under-

taking to commit the crime. Such action indicated that he sought to avoid discovery. Likewise, when he turned around and fled from the officers the conclusion is fully justified that he did so to avoid apprehension. During these events, as the trial judge indicated in his opinion, defendant proceeded deliberately, apparently with a plan in mind and knowing what he was doing and the possible results if he was detected.

After expressing concern because of the passing automobiles, defendant drove away to a more secluded spot where he forced the young woman from the car and proceeded to commit the crime with which he was charged. According to the witness he threatened to shoot her if she caused him trouble. After he committed the offense he tied her feet, her hands still being tied behind her back. He also told her not to leave the place until the next morning. He then got into the automobile and drove away. The young woman managed to free herself from her bonds and found her way to a highway where she was picked up by the driver of an automobile who took her to the Brighton police post.

Defendant went to Chicago and there contacted a friend with whom he left the guns that he had in the automobile that he had been driving. This friend was not a witness on the trial. However, he assisted defendant to get in touch with an attorney. Defendant then went to Niles, Michigan, where he left the Morrison car in an orchard and walked into the city. Counsel whom he consulted advised that he return to Ann Arbor. Defendant indicated in testifying in his own behalf on the trial that he was advised by counsel not to make or sign any statement. On being interviewed by members of the sheriff's department of Washtenaw county he told them that he had lost the guns that he had in the car, admitting in his testimony that he had falsified

in that statement. It was his claim to the officers, after having consulted with the attorney, that he had no recollection of the events in the early morning hours of July 9th. It should be noted that the attorney first consulted by defendant did not represent him on the trial.

In preparation for the trial defendant was examined by psychiatrists who testified in his behalf with reference to his mental condition on the night in question. The testimony of these psychiatrists indicated that they had accepted as true defendant's assertion that he had no recollection of what had occurred at the time of the commission of the offenses in question, and their answers to questions propounded to them indicated that their opinions were influenced in large part by their belief that defendant was telling the truth with reference to his inability to recall his acts during the period here involved.

The trial judge, emphasizing the conduct of the defendant at the time the offenses were committed, his obvious efforts to intimidate and frighten his victims, and his attempts to avoid detection, came to the conclusion that defendant was not truthful in asserting a complete lack of memory. In consequence, the judge declined to accept the opinions of the psychiatrists who testified in defendant's behalf, basing his conclusion on the undisputed testimony with reference to defendant's conduct prior to the commission of the offenses for which he was prosecuted, and following. Several witnesses in defendant's behalf who had known him for considerable periods of time testified in the case, as did his mother and his wife. It does not appear from the testimony of such witnesses that defendant had on any prior occasion evinced conduct indicating that he was possessed of a schizoid personality. It does not appear that he had had occasion to consult a psychia-

trist at any time prior to July 9, 1961, or that he had received psychiatric treatment. Likewise, following. said date there is no proof that he sought psychiatric treatment but, rather, that he went to the psychia-. trists who testified in his behalf for the purpose of. obtaining assistance in the presentation of his defense on the trials.

As a witness in his own behalf defendant was ques-. tioned as to his activities during the evening of July 8th. His answers indicated that he had a rather spe-. cific recollection as to what he did and where he went. He testified that he and a friend went to a place. called the "German Park", that on the way his friend objected to his driving so fast, that when they reached the park they went in and bought tickets entitling them to purchase therewith food and liquid refreshments, and that he remembered leaving the. place. He also recalled that after he left he was. involved in an accident in which his car was damaged. He left his friend at the German Park with the understanding that the latter would go home. with some other guest or guests present. This friend was a witness on the trial, stating that he was with defendant from about 8 o'clock in the evening until the departure of defendant from the German Park at about midnight. He referred to defendant's. driving at a rapid rate of speed, and stated that when he asked him to drive slower defendant did so. This witness testified that, other than the matter of the driving, defendant's actions were normal, and that when defendant left he said goodbye.

The commission of the offenses here involved occurred shortly after midnight. It is significant that up to the time he left the German Park defendant gave no indication that he was not in full posses-sion of all of his faculties. It is significant also that he left the place alone, and that he was carrying weapons in his automobile as well as a coil of rope,

These articles were placed in the car earlier, at a time about which there is no question as to defendant's sanity. He gave no explanation on the trial as to why he had them in his car, but it clearly appears from the undisputed testimony that he used both a gun and the rope in the commission of the offenses that he was charged with having committed.

We cannot agree with counsel for defendant that the trial judge was in error in failing to accept the opinions of the psychiatrists who testified in his behalf. It is somewhat significant that at least 1 psychiatrist whom he had consulted was not brought in as a witness, and another member of the same profession who had sat on the commission that found defendant competent to assist in his defense and to understand the nature of the proceedings against him testified on behalf of the prosecution to opinions that he had formed at variance with those of defendant's psychiatrists.

It was the duty of the circuit judge as the trier of the facts to weigh the testimony in the case, to determine the factual issues presented in accordance therewith, and to render verdicts accordingly. That the judge did this in the instant cases is not open to question. His analysis of the testimony indicates that he gave full consideration thereto. As against the opinions of defendant's psychiatrist witnesses he had undisputed proofs that were obviously at variance with such opinions. Said witnesses accepted as correct the statements to them by defendant. If such statements were not in accord with the truth, then clearly the opinions based thereon could not be accepted as having controlling weight.

The responsibility for determining the facts disclosed by the proofs rested with the circuit judge. In weighing the opinion testimony he was entitled to know, and necessarily to consider, the basis on which it rested. *Raub* v. *Carpenter,* 187 US 159 (23

S Ct 72, 47 L ed 119). The opinion of an expert must rest on a factual basis and if the facts given to the expert for his consideration are without proper support the trier of the facts cannot accept it. The trial judge concluded, and the record fully supports him in this respect, that the proofs relating to defendant's mental condition on July 9, 1961, and prior thereto and thereafter, were of greater weight than defendant's assertion that he could not recall the details of his conduct during the commission of the offenses charged against him, which assertion it appears was accepted and given controlling significance by the psychiatrist witnesses produced in his behalf.

The consideration of the weight to be given expert testimony in particular cases and under varying circumstances has been repeatedly considered by this Court, and other courts as well. In *McNally* v. *Colwell*, 91 Mich 527, 536, 537 (30 Am St Rep 494), it was said:

"It is best to limit expert testimony to its proper uses, since it is not now held in the highest esteem; nor has it been found to be free from the infirmities and temptations that belong to human nature. And since a man's opinion cannot be met and tested, as could his testimony to the existence of a fact, expert evidence, while useful in many cases, is dangerous in all, and should be restricted, for the purpose of accuracy in determining the truth, which is the aim of all judicial investigation, to those cases where its use is well nigh indispensable because of questions of science or skill being involved, in which a special and peculiar knowledge is desired in order to arrive at the truth."

In *People* v. *Hannum*, 362 Mich 660, it was recognized that opinion evidence by members of the medical profession might have been found by the trier of the facts to be outweighed by factual testimony

indicating sanity. In *Vial* v. *Vial,* 369 Mich 534, it was held that the trial judge was not bound to accept the opinions of defendant's psychiatrist when inconsistent with facts established by the proofs. In connection with such holding it was said (p 536):

"When the trier of an issue such as was framed below receives opinion testimony of mental incapacity or illness on the one hand, as against lay testimony of facts indicating knowledge of right, or wrong, of capacity and of fair understanding of the result and impact of emotional attitudes and changes thereof, there is no legal obligation to accept the former over the latter."

An interesting discussion of the weight to be given to expert testimony in itself, and in comparison with lay testimony, will be found in 86 ALR2d 1038, 1044, *et seq.*

The convictions and judgments are affirmed.

DETHMERS, KELLY, and O'HARA, JJ., concurred with CARR, C. J.

BLACK, KAVANAGH, and SMITH, JJ., concurred in the result.

SOURIS, J. (*dissenting*). Defendant, having waived trial by jury, was convicted after trial before Judge Breakey of the Washtenaw circuit, of robbery armed and rape. As Judge Breakey observed in rendering judgment, defendant did not deny committing either offense; he relied instead upon the defense of insanity. The sole issue before the trial judge was whether defendant was sane at the time he committed the offenses charged. Defendant's sanity having been put in issue by defense plea and evidence of insanity, the prosecution had the burden of proving his sanity beyond a reasonable doubt, as

it does every other essential element of every criminal charge. *People* v. *Eggleston*, 186 Mich 510. The controlling issue before this Court is whether there was sufficient evidence to support the trial judge's finding that defendant was sane beyond a reasonable doubt.

1. Nearly 100 years ago Mr. Chief Justice COOLEY expressed a concern which persists today whenever judicial inquiry focuses upon insanity as a defense to criminal charges. Speaking for the Court in *People* v. *Garbutt*, 17 Mich 9, 16, 17 (97 Am Dec 162), Justice COOLEY observed:

"Those questions which relate to the discovery and proof of insanity in criminal cases, are perhaps the most difficult of any with which courts and juries are compelled to deal. Mental disease is itself so various in character, so vague, sometimes, in its manifestations, and so deceptive, especially in its early stages, and its causes are so subtle and so difficult to trace, that the most experienced experts are sometimes obliged to confess that, however careful and thorough their investigations, they still prove unsatisfactory, leaving the mind not only in a condition of painful uncertainty upon the principal question whether mental disease actually exists, but when its actual presence is demonstrated, failing utterly, in many cases, to trace it to any sufficient cause. This fact is very forcibly brought home to us by the conflicting views expressed on criminal trials by careful, experienced and conscientious medical experts, who, regarding the same state of facts in the light of their scientific investigations and actual but diverse experience, are forced to express differing views, in consequence of which juries, in these difficult cases, are sometimes left in a state of greater doubt and difficulty, if possible, than if no such evidence had been given. The case of *Freeman* v. *People*, 4 Denio (NY) 9 (47 Am Dec 216), and the more recent and noted case of the forger Hunting-

ton,* are conspicuous instances in illustration of this truth; but others will readily occur to the mind."

Our current reports reflect the continuing expression by psychiatric witnesses of conflicting views of criminal defendants' sanity notwithstanding their presumptively increased knowledge of diseases of the mind.

However, in this case, the psychiatrists' opinions of defendant's sanity were *not* in conflict. It is not at all accurate to imply, as does Mr. Chief Justice CARR, that the prosecution's psychiatrist-witness expressed opinions as to defendant's sanity in conflict with the opinions thereon expressed by defendant's psychiatrist-witnesses. Defendant's psychiatric witnesses, Drs. Waggoner, Watson, and Bird, each testified that in his opinion defendant, at the time of commission of the robbery and rape, could not control his actions in the sense that he could choose between doing that which he knew to be right and that which he knew to be wrong. Dr. Waggoner described defendant's criminal conduct as an acute episode occurring to an ambulatory schizophrenic and that defendant had lost contact with reality. His diagnosis was schizophrenia or schizoid personality. Dr. Watson also diagnosed a long time schizophrenic personality disorder culminating on the night in question in an acute disassociative reaction or a schizophrenic reaction. Dr. Bird testified that in his opinion defendant lost contact with reality on the night he committed the offenses charged and that his conduct was then psychotic. His diagnosis was acute schizophrenic reaction. Dr. Ziegler, a clinical psychologist, conducted 7 psychological tests upon defendant for use by the psychiatrists, including the Wechsler-Bellevue, Ben-

---

* See Trial of Charles B. Huntington. Voorhies, publisher, 1857. —REPORTER.

der Gestalt, Kuder preference, thematic appercep-
tion, Rorschach, withdrawn person and abstractions
tests. It was his conclusion that defendant demon-
strated a basic schizophrenic personality structure.

Dr. Himler, the prosecution's psychiatrist, testi-
fied that in his opinion defendant knew the difference
between right and wrong but that "his ability to put
this concept into effect was impaired"; that although
his conscious mind knew what was wrong, it did not
dictate his behavior; that although his conscious
mind knew right from wrong, "it was not operating
at the time the unconscious and aggressive sexual
drives were in possession." He described defendant
as having been in a disassociative state on the night
in question and as having been then mentally ill and
unable to control all of his behavior. Dr. Himler
testified that, induced by increasing stress and de-
fendant's consumption of alcohol, there was a grad-
ual transition from a schizoid personality to psy-
chotic, with consequential loss of contact with reality.
He testified that defendant's behavior was influenced
by 4 factors: (1) the alcohol defendant consumed
on the day of the crimes, (2) his psychotic develop-
ment, (3) his predisposing schizoid personality
structure, and (4) certain psycho-emotional stresses
occurring in defendant's life, including the death
of defendant's infant son shortly before the events
here involved. He conceded, on cross-examination,
that his opinion was not dissimilar to those of the
defense psychiatrists excepting only for "some dif-
ference in emphasis."

We do not have in his case the jarring conflicts
sometimes encountered between opposing expert
witnesses. Indeed, in Dr. Himler's words, the most
that can be said is that there is "some difference in
emphasis" upon the relative importance of the fac-
tors influencing defendant's behavior. What is most
significant, however, is the unanimity of agreement

among all the psychiatrists that on the night in question defendant was schizophrenic, that his behavior was psychotic and that the mental illness he suffered repressed his knowledge of right and wrong to such an extent that he could not exercise his will to control his behavior. Defendant was, in other words, legally insane, *People* v. *Durfee,* 62 Mich 487, and *People* v. *Quimby,* 134 Mich 625, at least as far as the testimony of all of the psychiatrists is concerned.

In *Durfee* the following jury instruction was approved by this Court:

" 'It must appear in this case that the defendant is a man of sound mind. \* \* \* If, by reason of disease, the defendant was not capable of knowing he was doing wrong in the particular act, or if he had not the power to resist the impulse to do the act by reason of disease or insanity, that would be an unsound mind.' " (p 493)

If defendant's concept of right and wrong was not operating, what we approved in the *Quimby Case,* at p 636, is applicable:

" 'If she knew right from wrong, and at the time of the act she had by mental disease so far lost the power to choose between right and wrong that her free-will agency was at that time destroyed, and the criminal act was so connected with such mental disease as to have been the sole cause of it, then the respondent would not be responsible, and your verdict should be "Not guilty," because of insanity.' "

We have but recently, in *Vial* v. *Vial,* 369 Mich 534, 536, observed that psychiatric testimony indicating mental illness may be disregarded by the trier of the facts in favor of "lay testimony of facts indicating knowledge of right, of wrong, of capacity and of fair understanding of the result and impact of emotional attitudes and changes thereof." Had

the trial judge rejected the psychiatrists' opinions in favor of such lay testimony, our task would be substantially different than it is. But, here, we know from the opinions filed by the trial judge in rendering judgment and in denying defendant's motion for new trial, that this was not the basis for his disregard of the expert opinions of all psychiatrists who testified. Nor, indeed, is this "a case of the court appearing to fly in the face of psychiatric testimony, substituting the court's opinion as to sanity or insanity fundamentally for that of the psychiatrists," as Judge Breakey took care to note in his opinion denying new trial.

Instead, what we have here is a trial judge finding as a fact that 1 part of the data observed and relied upon by all psychiatrists who testified (defendant's inability, at the time of his psychiatric examinations, to remember details of his behavior during the night in question) was false. Having so found, the trial judge thereupon concluded that the opinions expressed by the psychiatrists were consequently invalid, because based in part upon data the judge found to be erroneous, and for that reason not entitled to probative value.

With due regard for the heavy burden imposed upon the prosecution in criminal cases generally, and in this case specifically,—to prove defendant's sanity beyond a reasonable doubt, we can agree readily that a judicial fact finder properly may disregard any opinion evidence if dependent upon demonstrably erroneous facts. This is not to say, however, that the fact finder may capriciously reject as erroneous any asserted fact used as a basis for such opinion testimony without adequate support in the record for such rejection. For example, to assume an extreme situation, had there been evidence that at the time of defendant's psychiatric examinations, while denying recall of events to the psychia-

trists, the defendant had related such events in detail
to another person, then certainly the trial judge
would be entitled to find as a fact that defendant had
falsified his symptoms to the psychiatrists thereby
at least casting some doubt upon the validity of the
latters' opinions. However, absent evidentiary basis
for such a finding, it cannot be made any more prop-
erly than can any other finding of fact not supported
by the evidentiary record. It becomes necessary,
therefore, to determine whether there is such sup-
port in the record for Judge Breakey's finding that
defendant lied to the psychiatrists in denying recall
of pertinent events.

In this case, trial was to the court sitting without
a jury and the trial judge recorded his findings and
conclusions fully and ably in 2 detailed opinions, one
at judgment and the other upon denial of a new trial.
From these opinions, we are advised not only of the
facts found by the trial judge, but also his bases
therefor, each of which will be discussed in what
follows.

First. The defendant took the stand in his own
defense and repeated essentially the same story he
had given to the police officers and to each of the
psychiatrists, including his continuing inability to
recall the specific details of the robbery and rape.
The trial judge, as fact finder, was obliged to de-
termine defendant's credibility and, based upon his
observations of defendant (we are not told what
those observations were), concluded that defendant's
testimony that he still could not *then* remember de-
tails of the crimes was unworthy of belief and, *for
that reason,* rejected as likewise false defendant's
*earlier* statements to the psychiatrists that he could
not recall many of the details of events leading up
to the robbery and rape and his subsequent flight
to Chicago, although able to recall what occurred
prior to the crimes and subsequent to his arrival in

Chicago. Whatever credibility defendant's testimony concerning his memory at trial merited, it had no bearing upon the truth or falsity of defendant's statements of memory loss made weeks earlier to the psychiatrists such as was attributed to it by the trial judge. Rejection of defendant's trial testimony as false is not sufficient basis, standing alone, to conclude that defendant earlier had also falsified to the psychiatrists his lack of memory of crucial events.

Second. While carefully noting that he was not substituting his opinion of defendant's sanity for that of the psychiatrists, the trial judge observed that none of defendant's actions was "illogical or irrational" but, rather, that all of his actions were purposeful and indicative "of logical commission of 2 crimes, carefully planned and carried out", and thus they were inconsistent with a claim of memory loss. Even if we assume that defendant acted purposefully during commission of his crime (noting as we do so that the difference between purposeful and random or irrational behavior is substantially subjective and, for that reason, generally impossible for the untrained to discern), such purposeful action would not necessarily even suggest defendant was sane let alone that he lied to the psychiatrists about the extent of his memory. As early as 1838 Isaac Ray, in Medical Jurisprudence of Insanity (1st ed), wrote:

"That the insane mind is not entirely deprived of the power of moral discernment, but on many subjects is perfectly rational, and displays the exercise of a sound and well balanced mind, is one of those facts now so well established, that to question it would only betray the height of ignorance and presumption." (p 32)*

_____

* *Ibid.* (5th ed), § 18, p 26.—Reporter.

And in 1879 Justice COOLEY, in *Van Deusen* v. *Newcomer,* 40 Mich 90, 129, was equally perceptive:

"For myself I cannot assent to the proposition that the going at large of a person who is mentally disordered is in every case dangerous. It is a proposition that contradicts common observation. Many insane persons, even after they have become hopelessly so, are to all appearance perfectly harmless, and for years continue to discharge the common duties of life in the most regular and acceptable manner, being trusted by every one in those particulars to which the insane delusion does not extend. The law takes notice of the fact that in many cases the disease leaves the person in the responsible possession and control of most of his faculties, and that the same motives influence his action in the employment of them, that influence those not thus afflicted; in short, that the delusion is confined to a single subject or group of subjects, and in other respects leaves the person rightfully entitled to control his own actions. It may nevertheless be perfectly true that in every one of these cases there are possibilities of danger from the disease which circumstances have not yet brought out, and that every insane person may in a certain sense be considered a dangerous person, because he is more liable to sudden and unexpected manifestations of dangerous cunning or violence than a sane person would be."

If purposeful action is not inconsistent with insanity, even less is it inconsistent with loss of memory.

Third. It is suggested in the trial judge's opinion that defendant's "sincerity in claiming this [memory] difficulty is subject to grave question" because, although a college student with a high intelligence quotient, defendant did not seek psychiatric assistance until several weeks after commission of the crimes charged, and then only for purposes of litigation. The crimes were committed in July of 1961,

defendant's preliminary examination was held in August and his trial began in October. During this period of 3 months defendant was examined by at least 2 psychiatrists for the people and 4 psychiatrists and a clinical psychologist for the defense. (Only 1 of the people's psychiatrists and 3 of the defense's psychiatrists testified at the trial.) For 5 days during this period, at the request of 1 of the psychiatrists, he was hospitalized for psychiatric examination and observation. Under such circumstances, it would be unrealistic to expect any person in defendant's position to undertake, in addition to all of that, psychiatric treatment during the few weeks preceding his scheduled trial, even assuming such treatment might have been medically feasible. In any event, failure to do so has no bearing whatever upon the issue involved: did defendant lie to the testifying psychiatrists when he denied to them his capacity for detailed recall?

Fourth. Each of the psychiatrists who testified, including the prosecution's, affirmed his belief that defendant was not able to recall details of his crimes and that such memory loss was entirely consistent with their diagnosis of his condition, representing to them the involuntary repression of past events, —in the words of the prosecution's psychiatrist on redirect examination: "I think these memory traces are deeply repressed, almost as a guard against dissolution of his personality." During this period, the psychiatrists could have attempted to induce recall of pertinent events by chemical injection. And, indeed, such plan was formulated and attempted. However, upon admission to the hospital for administration of the "truth serum", defendant angrily refused to stay in the high security "closed" ward of the hospital considered necessary as a safety measure by the psychiatrists because of the possibility that defendant "might go out of control com-

pletely" following use of the drug for such purpose. Upon defendant's voluntary return to the hospital the following morning, the drug could not be administered then because it was learned he had eaten breakfast.

Some of the psychiatrists testified they were extremely reluctant to administer the drug to defendant because, in the words of the chairman of the department of psychiatry at the University of Michigan and director of its neuropsychiatric institute: "I considered his personality structure so fragile— so brittle—that I was afraid I would precipitate an acute psychosis if I used one of those procedures with him." It is a fair inference that further efforts to induce recall by drug injection were abandoned by all the psychiatrists upon realization, from defendant's angry reaction to the aborted attempt to do so, of the potential danger involved for defendant.

The trial judge refers to defendant's refusal to stay in the closed ward of the hospital for the truth serum test apparently as further evidence of his prevarication to the psychiatrists of memory loss. Defendant's voluntary, unsolicited return for the test the following day negates any inference such as was drawn from failure of the first attempt. Furthermore, the psychiatric testimony relating to this matter was that defendant's conduct under the circumstances was entirely consistent with their diagnosis and, to some, it suggested an incipient break-down of defendant's self-control.

Fifth. Finally, reference is made by the trial judge to the fact that after recovering consciousness of time and place, on the morning following commission of his crimes, defendant sold a tire belonging to his robbery victim, transported the stolen car over a State line back into Michigan and, prior to surrendering himself, concealed the stolen car. What bearing these actions have upon the veracity

of defendant's subsequent statements to the psychiatrists is not clear from the judge's opinion. Nor do I perceive there is any relationship in this peculiar case between defendant's actions in effectuating his voluntary surrender to authorities and the veracity of his subsequent statements to psychiatrists as, perhaps, there might be in determining the credibility of defendant whose criminal record is such that his testimony at trial is unworthy of belief. See, for example: *People* v. *Finks,* 343 Mich 304, 307, 308 (51 ALR2d 934), which cited and relied upon CL 1948, § 617.63 (Stat Ann § 27.912), now found at PA 1961, No 236, § 2158 (CLS 1961, § 600.2158 [Stat Ann 1962 Rev § 27A.2158]).

None of the foregoing grounds relied upon by the trial judge to support his finding that defendant lied to the psychiatrists logically leads to such a finding. Furthermore, even if we assume that each did logically support the finding of prevarication adverse to defendant, each also is subject to a perfectly reasonable finding to the contrary favorable to defendant. Furthermore, there is uncontroverted testimony in this record to the effect that defendant's asserted memory loss was consistent with the diagnosis otherwise made of his condition by the testifying psychiatrists:

Waggoner:

"I know that this man's mental condition is such that the kind of occurrence [memory loss] which has been described could occur even though he might have lied about it."

Watson:

"[Loss of memory] was entirely consistent with his total defense pattern."

Himler:

"Memory traces are deeply repressed, almost as a guard against dissolution of his personality."

We have in the past ruled, as in *People* v. *Millard,* 53 Mich 63, that it cannot be said the prosecution has carried its burden of proving every essential element of its case beyond a reasonable doubt unless every reasonable theory consistent with innocence is negatived. I cannot see how we can say that the prosecution was entitled to the judge's finding that defendant lied to the psychiatrists, a finding crucial to the essential element of defendant's sanity required to be proved by the prosecution beyond a reasonable doubt, any more readily than this Court was able to say in the *Millard Case* that the prosecution carried its burden of proving deceased died from poisoning rather than from a disease. In *Millard,* the Court reversed a conviction which was based upon proofs that deceased's symptoms during her last illness were characteristic of arsenic poisoning. Although arsenic was found in deceased's body after exhumation, there was no evidence to prove that it was ingested by deceased before death except by inference from her reported symptoms. Reversal was based upon the fact that the symptoms were also characteristic of diseases the existence of which was not negatived by the prosecution beyond a reasonable doubt. Mr. Justice CAMPBELL, speaking for the Court, said:

"But beyond this there was a medical question upon which the case very largely depended, and that was whether the symptoms of the fatal sickness were certain indications of poisoning and its effects on the system of the deceased. If such was beyond doubt the character of the symptoms, the ambiguity of the other post mortem appearances and discoveries would be greatly lessened or removed. If the symptoms were ambiguous, or if they belonged to some disease or malady, they might raise such probabilities as to negative guilt, or such reasonable doubts as would make it improper to convict.

"Upon this last question of the character of symptoms, an important class of assignments of error is presented, which substantially relate to the burden of proof. While properly laying down in various places the general doctrine requiring the jury to convict only where they had no reasonable doubt, the effect, nevertheless, of several rulings was to indicate —intentionally or unintentionally—that testimony introduced by the defendants upon this particular class of appearances and their meaning, was in the nature of an affirmative defense, and that the people were not bound to exhaust their proof so as to negative all results but poison. This led to the allowance of more or less testimony as rebutting, which respondent claimed belonged to the principal case, and to the natural inference (and comparing the charge and refusals to charge with some other rulings on testimony, to the necessary inference) that the defense had the burden of proof to meet the presumptions supposed to be raised by the prosecution.

"This idea is not correct. In every criminal case the burden is throughout upon the prosecution. Whatever course the defense deem it prudent to take in order to explain suspicious facts or remove doubts, yet it is incumbent on the prosecution to show under all circumstances, as a part of their own case, unless admitted or shown by the defense, that there is no innocent theory possible which will, without violation of reason, accord with the facts. And in a case of alleged poisoning, where the symptoms and appearances during the last illness become controlling facts in determining whether the death was from poison or from disease, the charge is not made out unless the prosecution negative everything but poison as the cause of death. And this they can only do by showing affirmatively that the combined symptoms, and the absolutely certain facts with which they are associated, are inconsistent with any other disease or ailment. It has been generally regarded as unsafe to convict on symptoms alone, from

the danger of confounding the appearances of disease and poison. But it is little if any less dangerous to allow the presence of poison in a dead body, where there is no certainty whether it got there before or after death, to be given a presumptively guilty significance by symptoms which are themselves open to an innocent meaning. We doubt very much whether the learned judge who tried the case intended to hold differently, but we think the record indicates that such was the effect of his rulings." (pp 69–71)

See, also, *Hall* v. *People,* 39 Mich 717, 719; *People* v. *Foley,* 64 Mich 148, 159 (pertinently relied upon in *People* v. *Dellabonda,* 265 Mich 486, 510, 511); *People* v. *Stewart,* 75 Mich 21, 27, 28; and *People* v. *Ezzo,* 104 Mich 341, 342.

In the *Millard Case* the symptoms of deceased's final illness could have indicated death by arsenic poisoning or by disease and since the evidence produced by the prosecution did not negative all possibilities other than poisoning, the jury's finding of death by poison was reversed. Here, even if we assume that the reasons relied upon by the trial judge support his finding that defendant lied to the psychiatrists about his memory loss, those reasons are not inconsistent with a contrary finding of truth and, therefore, we must reverse the finding because not supported by proofs beyond a reasonable doubt.

2. But even if we should conclude that the trial judge's finding of fact was not erroneous, his conclusion based thereon, in my view, is erroneous, thereby requiring our reversal. The record discloses that the trial judge considered, as does Chief Justice Carr, that the truth of defendant's asserted memory loss was of controlling significance to the psychiatrists' diagnoses. In Chief Justice Carr's words, "If such statements were not in accord with the truth, then clearly the opinions based thereon

could not be accepted as having controlling weight." Close examination of the record reveals to me that no such exalted importance to the psychiatrists' diagnoses fairly can be attributed to the truth or falsity of defendant's memory loss.

It may help to examine what the psychiatric witnesses actually said concerning their reliance on the veracity of defendant's memory loss. Dr. Waggoner, on cross-examination:

"*Q.* And if, in fact, the defendant lied or did not tell the truth to you in your interview with him, this would affect your opinion, would it not?

"*A.* I do not believe it would because I know that this man's mental condition is such that the kind of occurrence which has been described could occur even though he might have lied about it, as you have described it, or about some of the things that he did tell me. This is why I went over these things several times—in order to be sure that he described the situation the same on each occasion."

Dr. Watson, on direct examination:

"I had no sensing at any time that he was deliberately distorting anything. I also presume that he was, in fact, making distortions. Every person does—but I had to work very hard to get memories, descriptions of things which the average person freely relates to you.   *   *   *

"Again, I would like to say that in evaluating an individual, we never take the words as factually true and factually accurate—I am speaking about factual in a lay sense—they are merely the impressions of the person; and we weigh them accordingly. We are not interested in the precise accuracy of them, nor do we feel the need to go out and check them all down, for we want to hear the way they are told us, and a good deal of our understanding of the patient is from this piece of data—not the precise accuracy of the point itself."

On cross-examination:

"*Q.* If in fact he did lie to you, then it would change your opinion, isn't that correct?

"*A.* No I do not think it would. * * *

"*Q.* If in fact he did lie, this would affect your opinion, I am not saying change it but affect it?

"*A.* Yes. * * *

"*Q.* Still and all doctor, you say your opinion would be different if he remembered what had happened that night?

"*A.* If he had been able to remember the events that evening, I would have to assume my basic picture of him psychologically was in error.

"*Q.* So that part of your conclusion is reached by the fact he tells you he cannot remember what happened that evening, yes or not?

"*A.* Part of my opinion, yes.

"*Q.* It would be different if he did remember?

"*A.* Yes, if he did remember I would have to see an awful lot of things different all across the board."

This apparent capitulation by Dr. Watson was explained on redirect examination when he stated that had defendant lied to him, he would have to change his opinion "as to how [defendant] defended himself in the face of emotional anger." It is obvious, then, that defendant's lying would not change Dr. Watson's opinion of defendant's insanity during the episode, but rather would affect his opinion of the *manner in which defendant coped with the memories of the consequences of his insanity.* By no means could the doctor's opinion be said to turn predominately on whether defendant was lying about his memory loss. Consider the following:

"*Q.* Well, I'd like to have your opinion as to the mental health of the defendant.

"*A.* Well, I was directing my examination to the question of his mental state at the time of the alleged crime.

"*Q.* That is the offenses that he was charged with, resulting from the events of July 8th and 9th? Is that right?

"*A.* That is correct. I arrived at the opinion that he is insane—or was insane at the time of the events for which he is being tried.

"*Q.* And will you tell us now the basis for that opinion, Doctor?

"*A.* If I may, I would like to begin by saying that what I was looking for in reference to these tests of sanity was that which had meaning to me as a psychiatrist. In other words, I wanted to find out the way in which Mr. Wingeart's mind operates, the forces that impinge upon it, the vulnerabilities that it has—and also to understand how he got that way, since I not having been present at the time, have to reconstruct from all the data that I can get of the nature of his psychological reaction at that time. Now, there are several mental operations that are relevant to the legal tests of sanity. First of all, it involves the process of knowing what is going on, of being able to think about it—and this, to a psychiatrist, means to be able to consciously manipulate the stimuli that come in from the surroundings—the seeing, doing, hearing, touching—the sensory material which comes into the mind. Now, once it is in there, it has to be weighed and judged by the individual or he cannot know what he is doing. This is a judgment process and this capacity to carry this mental maneuver out is 1 of the things I was evaluating. Now, the next thing I wanted to evaluate was how he tests out in experiments with the world in which he lives. We call this reality testing, being able literally to experiment with life and its problems. This is a very specific mental operation which is crucial to an individual being in contact with his surroundings and reacting to it and making choices about it. The next area that I specifically was interested in was the nature of and the manner of functioning of Mr. Wingeart's what we call conscience, the conscience being the part of the mind that first

of all, holds values—moral values and so forth, and secondly, the way these values impinge on the 2 mental operations. These 2 operations are closely related and may not be separated from each other. I wanted to know how he decides what to do and what not to do, this being related to the question of his sanity. Now, lastly, I wanted to know what kind of control machinery he possessed mentally. How does he decide when to do something and when not to? Is this a conscious process or is it blind and unconscious or uncontrolled? This, again, is a crucial psychological operation related to the test of sanity that the law calls, I believe, the irresistible impulse. How are impulses resisted and when do they become irresistible? I wanted to find out specifically how Mr. Wingeart handles the inner drives and wishes and feelings and frustrations that every human being must handle. Now, routinely, the psychiatrist in making these evaluations has to put them in the context of the way they got there. How does a person grow these tools? None of these capacities are inborn. All of them are developed and are the function of one's environmental experience. They are in a very real sense the results of the individual's experimenting with life and the forces that have impinged upon his particular life. Now, for this reason, this forces us to look into the total family relationship. We want to know what the parents are like, and this is a routine process in our evaluation system. What kind of a person was the mother and the father? What kind of person was chosen as the wife? And we begin with the presumption that these things are closely interrelated and not accidental. I wanted also to find out what specific types of stress situations are particularly meaningful to Mr. Wingeart. Again, it is 1 of our psychological presumptions that everybody has areas of sensitivity, and if you push them hard enough in that area, they will go beyond the level of control. Therefore, to understand any person, you have got to find out what they perceive as stress—and this is an extremely personal

and individual matter. Now, lastly, in this regard, I wanted to understand how the events of the night of this act were perceived and viewed by Mr. Wingeart —what existed in that situation that may have particular meaning for him? Now, with these thoughts in mind, I advanced to the accumulation of information—and I got this by simply asking Mr. Wingeart to tell me about his background. I would like to say from the [outset], that I immediately experienced difficulty in examining him. It is highly significant in terms of understanding his behavior. I had great difficulty in getting specific details from him. He did not readily tell me his life's story—and this was not by any conscious guarding. He was doing his level best, as a matter of fact, to cooperate with me. I had no sensing at any time that he was deliberately distorting anything. I also presumed that he was, in fact, making distortions. Every person does—but I had to work very hard to get memories, descriptions of things which the average person freely relates to you. I think if I had left him purely to his own devices, he would have told me his life's history in about 5 minutes, which is a remarkable condensation, to say the least."

Dr. Bird, on cross-examination:

"*Q.* It was based primarily on his memory, he was able to remember, isn't that right, doctor?

"*A.* No not solely on his memory, I tried to make that clear * * *.

"*Q.* And this is based on his inability to tell you of his actions, other than fragmentary, is that right?

"*A.* No, this is based on the evidence that I have been citing. * * *

"*Q.* So that your opinion is based primarily on the inability of the defendant to remember?

"*A.* Not primarily, this is 1 important consideration, there are the others I mentioned to you. * * *

"*Q.* If the defendant in fact, were lying to you, this would have a very great bearing on your opinion?

"*A.* It would certainly, if it could be demonstrated that the defendant was lying, yes sir it would have a bearing."

Note Dr. Bird's minimization of the importance of defendant's veracity regarding his asserted memory loss. Certainly it would have a bearing on his opinion, as would any other data derived from defendant's behavior, but nowhere does this psychiatrist, or any of the other psychiatrists who testified, indicate he would attach controlling significance to it.

It is interesting to note also that Dr. Himler, the prosecution's psychiatrist, had no doubt concerning defendant's memory loss:

"*Q.* You do agree that the defendant has no conscious memory of certain things that he did on the night in question, doctor?

"*A.* I believe that. * * *

"*Q.* Do you feel that is what the defendant is suffering from at the present time in regards to his memory?

"*A.* Yes, I think these memory traces are deeply repressed, almost as a guard against dissolution of his personality."

Even if the trial judge's finding that defendant lied to the psychiatrists regarding the extent of his memory of pertinent events were affirmed, it does not follow that he was justified for that reason to reject the psychiatric testimony that defendant was insane. From the foregoing testimony it seems clear to me that the psychiatrists themselves refute the suggestion that their *diagnoses* would have been altered had defendant's statements to them regarding his memory loss been "not in accord with the truth."

3. In his opinion for affirmance the Chief Justice states that when Wingeart left German Park, "he was carrying weapons in his automobile as well as a coil of rope. These articles were placed in the car earlier, at a time about which there is no question as to defendant's sanity." I find no evidence whatever in this record to support, directly or inferentially, the statement that defendant had weapons in his automobile when he left German Park and that they had been placed there earlier. As a matter of fact, the only evidence directly relating to the possible presence of weapons in defendant's car before he left the park is found in the testimony of defendant's friend Dikman, who accompanied defendant to the park. Dikman testified on cross-examination that he saw nothing in the car while he was in it. The only inference which can be drawn from this record is that defendant took the weapons from his apartment and placed them in his car *after* he left German Park, *at a time about which there is substantial question as to defendant's sanity.*

*Conclusion:* I would reverse defendant's conviction and remand for new trial. First, there is no valid record support for the trial judge's finding that defendant lied to the psychiatrists. Absent such finding there is no basis for appellate belief that the trial judge would not have agreed with the unanimous view of all psychiatrists who testified,— that defendant was insane. In fact, he could hardly have reached a contrary conclusion in the light of this record and in the light of the prosecution's utter failure otherwise to carry its burden of proving defendant's sanity beyond a reasonable doubt. Second, even if this Court should decide for any reason not to reverse the trial judge's finding of fact, it does not follow therefrom that the trial judge was entitled to disregard, as he did, all the psychiatric evidence

of insanity none of which was dependent upon defendant's veracity.