PEOPLE *v.* ENGLISH

1. CRIMINAL  LAW—DEFENSES—INSANITY—PRESUMPTIONS—EXPERT TESTIMONY—BURDEN OF PROOF.

> The people were not required to introduce affirmative expert testimony that defendant was sane to meet their burden of proof in a criminal case, so that where defendant introduced expert testimony that he was not criminally responsible at the time of the occurrence of the crime, and cross-examination produced contradictory testimony, and the people produced eyewitnesses to the crime who tesitfied to defendant's behavior and state of mind before, during, and after the crime, the court properly denied defendant's motion for a directed verdict.

2. CRIMINAL  LAW—DEFENSES—INSANITY—PRESUMPTIONS—BURDEN OF PROOF.

> The people's burden of proof in a criminal case requires that they prove defendant's sanity, like every other element of the offense, beyond a reasonable doubt, when the issue of insanity is raised.

3. CRIMINAL  LAW—DEFENSES—INSANITY—PRESUMPTIONS—INFERENCES—QUESTION OF FACT.

> The presumption of sanity of the defendant in a criminal case means that the people do not have to introduce any evidence of sanity when presenting their case in chief; however, when the issue of insanity is raised, the presumption of sanity

---

REFERENCES FOR POINTS IN HEADNOTES

[1–5] 21 Am Jur 2d, Criminal Law §§ 50–53.
[1–8] Modern status of rules as to burden and sufficiency of proof of mental irresponsibility in criminal case.   17 ALR3d 146.
[6] 31 Am Jur 2d, Expert and Opinion Evidence § 181 *et seq.*
[7] 31 Am Jur 2d, Expert and Opinion Evidence § 186.

changes from a mandatory inference to a permissive inference to be submitted to the jury for their evaluation.

4. CRIMINAL LAW—DEFENSES—INSANITY—PRESUMPTIONS—REBUTTAL EVIDENCE.

Expert testimony that a defendant in a criminal case was insane is sufficient to overcome the force of the presumption of sanity as a mandatory inference but it does not have the effect of overcoming the force of the presumption as a permissive inference to be submitted to the jury for evaluation where the defendant raises the issue of insanity.

5. CRIMINAL LAW—DEFENSES—INSANITY—BURDEN OF PROOF—EVIDENCE.

Affirmative testimony that the defendant was sane need not always be introduced in order to make out a case for the jury when the defendant's sanity is at issue.

6. EVIDENCE—EXPERT WITNESSES—CREDIBILITY.

Neither a jury nor a court sitting as trier of fact is bound to accept expert testimony.

7. WITNESSES—EVIDENCE—EXPERT WITNESSES—WEIGHT.

That experts' opinions may have been founded on inadequate or erroneous information is sufficient reason for a jury to reject the diagnoses of insanity by defendant's expert witnesses, where the prosecution produced many credible eyewitnesses who testified to the defendant's behavior and conduct before, during and after the crime, the defendant's expert witnesses made limited examinations 8 to 12 months after the crime, and the expert witnesses admitted that the defendant may have lied to them.

Appeal from Recorder's Court of Detroit, George W. Crockett, Jr., J. Submitted Division 1 June 9, 1970, at Detroit. (Docket No. 6965.) Decided December 9, 1970. Leave to appeal denied March 24, 1971. 384 Mich 823.

Willie English was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, *William L. Cahalan*, Prosecuting Attorney, *Dominick R. Carnovale*, Chief, Appellate Department, and *Angelo A. Pentolino*, Assistant Prosecuting Attorney, for the people.

*Arthur J. Tarnow*, State Appellate Defender, for defendant on appeal.

Before: DANHOF, P. J., and V. J. BRENNAN and J. J. KELLEY, Jr.,* JJ.

DANHOF, P. J.  The defendant was found guilty by a jury of murder in the first degree, MCLA § 750.316 (Stat Ann 1954 Rev § 28.548).  He was sentenced to life imprisonment.

On appeal the defendant argues that after the defendant introduced evidence of insanity, the prosecution failed to prove the defendant's sanity beyond a reasonable doubt as required by law. *People* v. *Krugman* (1966), 377 Mich 559, *People* v. *Eggleston* (1915), 186 Mich 510.  It is the defendant's position that cross-examination of the defendant's psychiatric witnesses was insufficient as a matter of law to sustain the prosecution's burden of proof.  The defendant maintains that the people had to introduce affirmative testimony that the defendant was sane in order to make out a case for the jury.  The defendant has cited no Michigan authority for this position and our research has disclosed none.  The annotation in 17 ALR3d, pp 184–190, § 8(a) and (b), indicates that those jurisdictions which have considered this question are about evenly divided as to whether the prosecution

---

* Circuit judge, sitting on the Court of Appeals by assignment.

must introduce affirmative testimony of the defendant's sanity in order to sustain its burden of proof.

Before the trial the defendant gave notice that he intended to rely on the defense of insanity. During the trial and before the people rested the defendant presented, out of order, the testimony of two psychiatrists who had examined him. One of the defendant's psychiatrists, Dr. Caberto, was also appointed by the court to examine and report on the defendant. Dr. Caberto testified at length and gave extremely contradictory testimony which is virtually impossible to summarize. Nevertheless, we try.

Based on three one-hour examinations of the defendant eight to nine months after the killing, Dr. Caberto testified on direct examination that at the time of his examinations, the defendant had a mental disease or mental disorder known as "psychoneurotic and disassociative reaction amnesia"; this mental illness belongs in the category termed non-psychotic which is not insane; this type of patient is not able to cope with this society so they disassociate; the defendant went into amnesia which is one of the defense mechanisms; defendant has a circumscribed period of time wherein he had amnesia; he used the defense mechanism just to blot out this distressful situation; amnesia is not voluntary, it is a subconscious thing; it is hard to differentiate actual amnesia and feigned amnesia; some amnesias are accounted for by organic brain disorder, but the defendant had no "organicity" or damage to the brain; and a person who suffers from this type of mental disorder does not have any difficulty controlling his conduct to the requirements of the law.

On cross-examination Dr. Caberto testified that the defendant was given only two psychological tests, an "IQ" test and an "ink blot" or Rorschach test; the

tests were given by someone else, although Dr. Caberto relied on the results in forming his opinion; when the doctor made his diagnosis there was no way to tell how long the reaction had been taking place; other than this blocking mechanism, the defendant's personality was normal; if the stressful situation was removed the defendant would be a normal human being; he had no opinion as to the defendant's mental state on June 10, 1967 when the killing occurred; defendant remembers some but not all of the incidents that took place on June 10, 1967; the diagnosis was based substantially on what the defendant told Dr. Caberto about his lapse of memory; it was possible that the defendant's disassociative reaction occurred after the alleged murder rather than during it; the defendant said that he could not remember what happened after a sharp blow in the groin until he was on the street; a sharp blow to the groin could not cause amnesia; and the amnesia did not occur before the alleged murder.

On redirect examination Dr. Caberto testified that the disassociative period was from the time that the defendant was kicked in the groin until he woke up on the street; during that time the defendant did not have conscious control of his actions; if the defendant shot a woman during that period he had no control of his compulsion; if he shot her, he wasn't able to conform to the requirements of law; the shooting caused the anxiety; the amnesia started with the kick in the groin; the doctor didn't know whether or not the kick in the groin was before the shooting; and the defendant did not tell the doctor about any shooting.

On recross-examination Dr. Caberto testified that the shooting was the real cause of the anxiety resulting in the disassociative reaction; after the shooting, the amnesia took place wiping out the

period of subconscious; and that it was possibly after the shooting, that the defendant's acts were uncontrolled. The witness' final testimony in response to questions from the prosecution follows:

"*Mr. Boak:* Doctor, once again. I just want to make it clear in my mind and, hopefully, in the jury's mind. Now, hypothetically, we have a situation where the defendant walked up after, supposedly, shooting at this woman's brother, walked up to the door of the woman's apartment. Can you tell me, at that time, was he under the anxiety which you call amnesia?

"*The Witness:* By that time, he tried to walk to the door. He was not. He was with some anxiety but not to the point he was disassociated.

"*Mr. Boak:* Now, at that point, he knew what he was doing?

"*The Witness:* Yes, sir.

"*Mr. Boak:* Then, hypothetically, he shot the woman and in other words, he knew he shot her and in order to blot this out from his mind, to wipe it out from his mind, he had this disassociative reaction which caused amnesia and forgot the entire thing?

"*The Witness:* Yes, sir.

"*Mr. Boak:* Then, subconsciously, this reaction caused him to say that he felt a sharp blow in the groin and forget the rest until he woke up in the street, is that right?

"*The Witness:* This blow in the groin, he remembers this.

"*Mr. Boak:* Well, but is this his subconscious memory?

"*The Witness:* He consciously remembers this blow in the groin.

"*Mr. Boak:* So it's your opinion that the blow in the groin actually happened?

"*The Witness:* Yes, sir.

*"Mr. Boak:* Would you change your opinion if independent evidence said there was no blows struck?

*"The Witness:* If there was no blow struck, I think —

*"Mr. Boak:* Would it change your opinion if there were no blows struck at the doorway?

*"The Witness:* If you can show me proof that there was no blow then I would change my opinion about this being a conscious—

*"Mr. Boak:* At that point, would you say it was the subconscious manifestation of the defendant's mind?

*"The Witness:* Yes, sir."

The defendant's second psychiatrist, Dr. Bresnahan, examined the defendant in the county jail about one year after the killing. On direct examination he testified that he had taken a "history" from the defendant; he had reviewed Dr. Caberto's report and diagnosis and had reached the same conclusion; the disassociative period may vary in length, some lasting for weeks or months; and the defendant did not have the ability during that period to choose between one course of conduct and another.

On cross-examination Dr. Bresnahan testified that he examined the defendant verbally for approximately one and one-half hours; his diagnosis was arrived at before he saw Dr. Caberto's report; and his opinion was based on what the defendant and his lawyer told him plus his experience about psychiatric cases. Responding to questions by the prosecution, Dr. Bresnahan testified further:

*"Q.* Now, are you able to determine or were you able to determine when this disassociative reaction started?

*"A.* This has to be based entirely on the testimony of Mr. English and what he said during the exam-

ination. Based on that, he stated that the last thing he remembers was probably around 10:30 in the evening and the next thing was one or two in the morning following the day. I would, therefore, assume that the disassociative period lasted approximately three hours, three to four hours.

"*Q*. Do you know whether the reaction started before or after the shooting?

"*A*. Mr. English has no recollection of a shooting or the shooting. Therefore, it began before, therefore, I would assume.

"*Q*. Isn't it possible, Doctor, to blot out something which has already happened?

"*A*. Yes.

"*Q*. Amnesia is a loss of memory, is it not?

"*A*. Yes.

"*Q*. Amnesia is one of the symptoms?

"*A*. Amnesia simply occurs with disassociative reaction and lasts for the period of the reaction.

"*Q*. Now, I am stating this hypothetically. If Mr. English, having a gun in his possession, went to the home of the deceased, knocked on the door, pushed and opened the door, shot the deceased, turned around and walked away, is it possible that he could block out the shooting itself through this disassociative reaction?

"*A*. Well, the disassociative, I'm not sure I understand you. Perhaps, could you clarify this a little bit?

"*Q*. Well, could the shooting, itself, cause the distress which in turn caused this disassociative reaction which in turn caused the loss of memory?

"*A*. Yes, it could have. I wouldn't have expected him to be able to recall the shooting in that the event—

"*Q*. Did he recall the shooting?

"*A*. Not in my examination.

"*Q*. So —

"*A*. My feeling is this disassociative period developed before any shooting occurred.

"*Q.* That's merely your opinion based on what he told you?

"*A.* And the reports that I have obtained.

"*The Court:* Do you have the report, have you seen?

"*The Witness:* Yes, sir.

"*The Court:* That report, however, was based only on what Mr. English told you, Doctor?

"*The Witness:* Yes.

\*        \*        \*

"*Q.* Is it possible that the stress which caused the disassociative reaction, which was later found in him, was caused by the shooting of Vera Parker, herself rather than earlier events?

"*A.* Well, as I have answered that question, I said if.this were the case, I would expect him to remember the shooting.

"*Q.* Is it possible, though, that even if that were the case that he wouldn't remember the shooting?

"*A.* I would say unlikely.

"*Q.* Is it possible that he could say to you that he didn't when, actually, he did?

"*A.* This is possible, yes.

"*Q.* In your verbal examination with Mr. English, did you go into details concerning the events of this evening?

"*A.* Well, some details. I'm not sure as to the matter of degree, I suppose.

"*Q.* Doctor Bresnahan, psychiatry is not what we would describe as an exact science at this point in time?

"*A.* That's correct because it deals with human beings and it can never be an exact one.

"*Q.* And there are many psychiatrists who could form various opinions about a certain set of facts and behavior, are there not?

"*A.* Yes.

"*Q.* So if your opinion varied from another psychiatrist's opinion in this particular case, is it pos-

sible one or both or none of you are right, is that correct?

"*A.* Certainly, that's possible, yes."

On redirect examination Dr. Bresnahan testified that he would not speculate on whether it was easy to feign this particular mental disease, but that in his experience he had never known it to occur; and people generally lack sufficient knowledge about psychiatry to be able to masquerade effectively.

The defendant did not testify. The people did not introduce any affirmative testimony that the defendant was sane. The people did produce a number of credible witnesses who gave eyewitness testimony as to how the defendant acted and what he said before, during and after the killing.

The deceased, Vera Parker, lived at 5560 John R, one of five units or houses. The defendant lived at 5552 John R. The deceased's sister-in-law, Sarah Alvis, lived between Mrs. Parker and Mr. English at 5556 John R.

Mrs. Alvis testified that on the evening of June 10, 1967 she was at home; her daughter, Frankie Lewis, and some other people were there too, including the defendant; at about 10 p.m. Vera Parker came to Mrs. Alvis' house and found her roomer, Green, there; the deceased started asking him about going off and leaving her house open; Green didn't say anything but the defendant said, "if one of them talked to me like that, I'd knock her down"; then there was an argument between the deceased and the defendant and Mrs. Alvis asked Mrs. Parker to go home; the deceased and Mr. English continued talking face to face; Mrs. Parker's brother, John Davis, knocked at the back door and was admitted by Mrs. Alvis; Davis grabbed English and they started fighting; English got his gun out and commenced shooting Davis who did not have a gun;

Vera Parker ran out the back door while the shots were being fired; and after the shooting, English went out the back door alone.

On cross-examination, Mrs. Alvis testified that before the deceased's arrival at her home, the defendant seemed calm; and there had been a general conversation among those present with no one appearing to be mad at anyone else.

John Davis testified that his mother-in-law told him his sister, Vera Parker, was in an argument; he went to take his sister home; he tried to find out what was going on and the defendant said something about his shirt being torn; Davis said, "Well, if that's all that happened, I will buy you a new shirt"; there was some running and hollering about a gun; and Willie English shot Davis four times.

Miss Christine Reed testified that she went out the front door of Mrs. Alvis' house after the disturbance started; she heard some shots; the defendant came out of the house bleeding from a spot on the forehead; he started towards the deceased's house; then he changed and went into his house; the defendant came out of his house two or three minutes later with "something in his hand"; he went up the steps of the deceased's house; the defendant was there two or three seconds and Miss Reed heard two or three shots; Vera Parker crawled through the door and fell on her side and then turned flat on her back; and then Willie English came out and went toward his house.

Mrs. Frankie Lewis testified that she lived with her mother, Sarah Alvis; there was a terrible argument between Vera Parker, Green, and Willie English; John Davis came in the back door and grabbed Billy (defendant) and came up beside his face with a razor; Davis said, "I only came in here to get my sister"; the defendant said, "You came in here to

cut me upsides my face"; then the defendant shot Davis four times; the defendant asked Mrs. Lewis, "Where is the bitch?" and Mrs. Lewis said she must have gone out the door; then English went to his house; Mrs. Lewis stood on her porch and saw English go past her carrying a gun; he went up to Mrs. Parker's house, kicked the door which came open immediately and shot Mrs. Parker; the deceased fell onto the porch; and then English walked back towards Mrs. Lewis and said, "You, Frankie, you saw it, will you tell it like you saw it?"

The substance of the testimony of Mrs. Alvis, John Davis, Miss Christine Reed, and Mrs. Lewis was supported by several other eyewitnesses who testified for the prosecution.

After the shooting police officers were dispatched to the scene. Immediately after the deceased was taken to the hospital, two officers were assigned to the defendant's home on a stakeout for him. Neither of these officers nor another were able to locate the defendant. During the afternoon of the second day following the shooting, the defendant came to the police station with his lawyer and surrendered himself. The defendant did not seem surprised when he was arrested.

At the conclusion of the people's case, the defendant moved for a directed verdict of not guilty by reason of insanity on the basis that the people had not introduced any evidence from which the jury could find that the defendant was sane at the time of the alleged crime. The trial court denied the motion stating,

"In this case, I believe reasonable men can differ on the one, the sufficiency of the examination made by the doctors on the defendant and two, on the validity of the opinions expressed by the doctors and three, whether or not, if there was mental in-

competency, it coincided with the crucial fact in this case, the alleged killing of the deceased.

"Under those circumstances, I cannot invade the province of the jury by granting your motion for a directed verdict and your motion is denied."

Having the burden of proof in a criminal case, as the people do, means that if the issue of insanity is raised the people have to prove defendant's sanity beyond a reasonable doubt, like every other element of an offense. *People* v. *Woody* (1968), 380 Mich 332.

Having the presumption of sanity means the people do not have to introduce any evidence of sanity when presenting their case in chief, and it means that when the issue of insanity is raised the presumption of sanity changes from a mandatory inference to a permissive inference to be submitted to the jury for evaluation. See *In re Wood Estate* (1965), 374 Mich 278. Although *In re Wood Estate* was a will contest case, not a criminal case, the reason for the holding therein is applicable to the present case. The court in holding that a motion for a directed verdict was erroneously granted specifically overruled prior civil cases which had held that if evidence was introduced to rebut the presumption of undue influence a directed verdict was in order. The Supreme Court said it was an issue for the jury's decision. The court reasoned that while the rebuttal evidence sufficed to overcome the force of the presumption of undue influence as a mandatory inference, it did not have the effect of overcoming the force of the presumption as a permissive inference to be submitted to the jury for evaluation.

Similarly in our case the defendant's expert's testimony sufficed to overcome the force of the presumption of sanity as a mandatory inference, but did not have the effect of overcoming the force of the pre-

sumption as a permissive inference to be submitted to the jury for evaluation. See also *Wirtanen* v. *The Prudential Insurance Company of America* (1970), 27 Mich App 260.

Based on our analysis of the pertinent Michigan cases, we are of the opinion that when the defendant's sanity is an issue it is not always necessary for the people to introduce affirmative testimony that the defendant was sane in order to make out a case for the jury. In *People* v. *Krugman* (1966), 377 Mich 559, it was held that since the defendant took the stand and testified and one of the participants in the crime also testified concerning defendant's behavior both before and after the crime, the jury had enough evidence of defendant's behavior and state of mind upon which to base an opinion that defendant was sane. The court held that the jury was not bound to accept the expert opinion of defendant's psychiatrist that defendant was insane.

In *People* v. *Wingeart* (1963), 371 Mich 264, it was held that where the defendant took the stand and several witnesses including the defendant's mother and wife testified in his behalf regarding his behavior, the judge who was the trier of fact was justified in forming an opinion that the defendant had lied to both the prosecution's and defendant's psychiatrists and the judge was not required to believe the psychiatric opinions of insanity where the judge thought they were based on lies of the defendant or, in other words, erroneous data.

Our case is distinguishable from *Krugman* and *Wingeart* since the defendant in our case did not testify. However, as indicated before the prosecution had many credible eyewitnesses who testified as to the defendant's behavior and comments, before, during, and after the shooting. Additionally, the common diagnosis of the defendant's expert wit-

nesses was based substantially on what the defendant told the expert witnesses in very limited examinations made 8 to 12 months after the killing. Both psychiatrists admitted that it was possible that the defendant had lied to them and that his distress arose only after the killing rather than before it. Thus, the jury had a foundation for rejecting the diagnosis of the expert witnesses because of the possibility that it was based on inadequate or erroneous information. The jury may well have found in this case, as the judge did in the *Wingeart* case, that the defendant lied to the psychiatrists when they were examining him.

In *People v. Scott* (1968), 11 Mich App 576, *leave to appeal denied* 381 Mich 783, the defendant argued that the only admissible testimony of insanity from both the people's and defendant's psychiatric witnesses was in agreement that defendant was insane and thus the people had failed to prove the *corpus delicti*. This Court held that the defendant's assumption that the jury was bound to accept the expert testimony of the psychiatric witnesses was erroneous, because the jury was at liberty to reject the expert testimony.

In *People v. Markham* (1969), 19 Mich App 616, 634, this Court said, "We find that since 'the jury is the ultimate judge of defendant's sanity at the time of the crime, and in this case, since it had before it evidence of defendant's behavior and state of mind upon the basis of which it could have found defendant sane at that time, it was not bound by the expert testimony of the doctor,' (citing *People v. Krugman*) *even in the absence of any cross-examination*". (Emphasis added.) While in our case the defendant did not testify, there certainly was an abundance of evidence of the defendant's behavior and state of mind

based on several credible eyewitness accounts from which the jury could have found the defendant sane.

Triers of fact are not bound to accept opinion testimony, however expert and authoritative, because opinion testimony is not of the highest order. *Vial* v. *Vial* (1963), 369 Mich 534. If, under all the testimony in this case, the jury was compelled to accept questionable opinions of fact, then the doctors, not the jury, would have been determining the facts. We do not think the law of Michigan requires such a result, nor do we think that it should require such a result.

The other issue raised by the defendant on appeal is whether the trial court erred in not permitting the timely discovery of police notes taken from witnesses' pretrial oral statements. This issue is of no merit for the reason that the judge did allow the defense counsel to see the unsigned police notes.

Affirmed.

All concurred.