STATE OF IOWA, Appellee, v. MATT JOHNSON, Appellant.

**ROBBERY:** Evidence—Sufficiency. Evidence held to sustain a verdict
1 of guilty of assault with intent to rob by aiding and abetting another.

**CRIMINAL LAW:** Instructions—Effect of Circumstantial Evidence.
2 Instructions reviewed, and held to properly present the effect of circumstantial evidence.

CRIMINAL LAW: Accessories—Aiding and Abetting. Principle reaf-
3    firmed that one who aids and abets the commission of a crime is
     treated as a principal.

*Appeal from Woodbury District Court.*—MILES W. NEWBY,
Judge.

JUNE 24, 1924.

REHEARING DENIED SEPTEMBER 26, 1924.

INDICTMENT for assault with intent to commit robbery.
Verdict of guilty, and sentence of five years' imprisonment in
the men's reformatory at Anamosa.    Defendant appeals.—
*Affirmed.*

*Gladys R. Yeaman,* for appellant.

*Ben J. Gibson,* Attorney-general, *Neill Garrett,* Assistant
Attorney-general, *O. T. Naglestad,* County Attorney, and *O. D.
Nickle,* Assistant County Attorney, for appellee.

ARTHUR, C. J.—I. The propositions relied upon for rever-
sal are that the evidence was insufficient to support the verdict
and judgment; that the court erroneously instructed the jury
on circumstantial evidence.    Undisputed facts
may be stated as follows: Otto Mitchell, prose-
cuting witness, was engaged in the business of
hauling stock and grain to market between Pierson, where he
lived, and Sioux City.    On the night of August 20, 1923, he had
made a trip to Sioux City with a load, and on the night of the
21st, shortly before midnight, he left Sioux City on his return
to Pierson, proceeding homeward on the Correctionville road.
At a place about two miles from the village of Lawton, he ob-
served a man standing on the running board of his truck, who
held a gun in his face.    The man ordered Mitchell to stop his
car and put up his hands, which Mitchell did.    Mitchell's car
traveled about 100 to 150 feet after he was ordered to stop,
before he got the car stopped.    The man then ordered Mitchell
to get out of his car, which Mitchell promptly started to do;

1. ROBBERY: evi-
   dence: suffi-
   ciency.

but as he started to get out, he picked up his own gun, which he had handy in the car. The man then stepped off the running board before Mitchell could get out of the cab. When Mitchell saw the man step off the running board, he slipped back under the wheel and started to release the brake; but as he went to release the brake, the man shot through the door of the cab. At this point Mitchell returned the fire, shooting twice, and observed that he hit the man, and that he staggered into the road. Four shots were fired by the bandit. One of these bullets hit Mitchell in the thigh, but did not seriously injure him. Without getting out of his car, Mitchell drove on to Moville, where he met Charles Gustine, an officer. Gustine called a Mr. Grau, and told him there had been a holdup; and while Gustine and Grau were talking, there was a phone call into Moville for a doctor, from the Stickley place, about two and one-half miles west of where the shooting occurred. Mitchell, Gustine, and Grau then got into a car and drove to the Stickley place, and there found a man lying on the ground dead, with a gun lying on his breast. Appellant in this case was sitting in his Ford car. Appellant was arrested and placed in jail in Sioux City. The man whom Mitchell killed was George Johnson, brother of appellant. Appellant was 23 years of age, and his brother, George, was 28. Appellant owned the Ford car in which he and his brother rode from Sioux City out to where the tragedy occurred, appellant driving the car. At the place where the tragedy occurred, appellant stopped his car, and the brother got out of the car, and appellant shut off the engine and turned off the lights. Appellant saw a car coming up the hill from Sioux City, which turned out to be the Mitchell car.

II. Gustine and Grau, called as witnesses for the State, testified to driving with Mitchell to the Stickley place, and there finding appellant sitting on the running board of his car, and his brother, George Johnson, lying on the ground, dead, with a gun resting on his body; that they had some talk with appellant, in which he said:

"I just took a ride with my brother. I was playing pool, and my brother said, 'I want to take a ride;' and so we came out

this way to visit. The only time we get to visit is on an evening.''

Grau said to appellant:

''This is a doubtful place to visit, out on the pavement between Moville and Sioux City, at 1 o'clock. Why don't you take your brother home with you?''

Appellant answered, ''We have only two small rooms.'' Grau said, ''That is large enough for you two, isn't it?'' Appellant answered: ''I didn't know my brother was going to do this. If I had known he was going to do it, I wouldn't have come out.''

Beardsley, sheriff of Woodbury County, testified to a conversation, the next day after the assault, in which appellant stated that he was working for the Great Northern Railway Company; that his brother had arrived in Sioux City about a week before; that his brother occasionally came to his house in the evening, but generally he met him down town, and they played pool together; that on this particular night, they had been playing pool, and his brother wanted to go out and drive around a little bit and visit, and they drove out on the Correctionville road several miles, and turned around and started back toward Sioux City; that, shortly after they turned around, his brother said to him, ''Pull up along the side of the road and stop,'' and he drove his car along the side of the road, headed toward Sioux City, and stopped, and his brother got out of the car, and he sat behind the wheel; that, about that time, the Mitchell truck came along, and he looked out and saw his brother running after the car, and called to him to come back; that, after he heard the shots and saw the flash of the guns, he ran down the road, and saw his brother along the side of the pavement; that he took him to a farmhouse, and while they were there, officers came and arrested him.

Levi Stickley, called by defendant, testified that he lived on a farm about four miles from Lawton; that he is a second cousin of appellant's; that appellant came to his house on the morning of the 21st of August, bringing his brother George; that George was still alive, and appellant told him to phone for a doctor; that George died about twenty minutes afterwards;

that, on the day before the tragedy, appellant and his wife and George Johnson visited at his place; that appellant and his brother were also at his place on Tuesday evening before; that he told Matt (appellant) to lay the revolver on George's breast, so that the officers could get it, and Matt did so; that George did not have a handkerchief over his face when he was brought to his place; that there was one around his neck.

Two employees of the Great Northern Railway Company testified that appellant had worked for the company steadily for about a year, and that his character was good.

Appellant testified in his own behalf, in substance, as follows: That he was born in Jackson County, Iowa, and lived near Anthon in Woodbury County with his parents for about twelve years, then near Pierson, Iowa, then moved back to Jackson County and lived for a while; that he enlisted in the army at Cherokee, Iowa, at the age of 17 years; that he went overseas in the Rainbow Division, and was engaged in several battles; that he was discharged from the army in November, 1919, and returned to Woodbury County, and worked around Correctionville on farms for about a year, then went to Kimball, South Dakota, and worked on farms; that he got into some trouble at Kimball; that he was charged with forgery, and pleaded guilty, and was sentenced to the penitentiary for a term of 18 months, and served 9 months, and then came back to Kimball and worked around there for a year or so, and then went to work for the Great Northern Railway Company, and was working for said company when this affair occurred, only losing one day in about a year; that he had not seen his brother George since the fall of 1919, until he came to Sioux City, a few days before the tragedy; that he did not know at what hotel his brother was staying; that he said to his brother, ''We have only got a couple of rooms, but you can come up there if you want to;'' but that his brother refused to do so. Witness testified that, the night before the shooting, he and his wife and George visited at his cousin's place, out in the country, at Mr. Stickley's; that, the evening before the occurrence, his brother went home with him to supper, and after supper they went down to the pool hall and remained there playing pool until late in the night, when he told

his brother that he was going home, and his .brother then said, "Let's go for a ride;" that they drove out on the Moville road, the same road they had previously gone when they visited their cousin, Stickley; that he had no revolver, and did not know that his brother had one; that he did not know that his brother was intending to hold anybody up; that they drove out quite a ways toward Moville; that his brother wanted to go to Moville, but that he told him he wouldn't go to Moville, as he had to get back and work the next morning; and that he turned around and started back, and when he had driven a couple of miles, his brother George said, "Stop the car, I have to urinate;" that he stopped the car; that George said, "Shut off the engine and turn off the lights;" and that he did so, and never paid any attention to his brother. Asked what happened at this point, witness answered:

"Well, there was a car coming kind of up the hill, and the reflection showed on there, and I never paid any attention to it; and just as the car got even, or passed, the car kind of shook, and I looked, and he was running after the car, and he leaped on the back of it. I didn't know George was going to do what he did."

He further testified that, after George started to run, he called to him, "What are you going to do?" that he thought George was "kind of sore,—him and I had been arguing because I wouldn't do what he wanted me to do." Witness further testified:

"I heard the shots and seen the flash of the revolver, is all I seen. The truck kind of stopped then, and I heard someone holler, and I beat it right down there; and when I got there, he was lying on the ground, with his face down, and he had the revolver in his hand; and I went right back and got the car and drove up there and picked him up and put him in the car and took him to the cousin's. He was unable to talk to me. I took the revolver out of his hand. It seemed to me he had a death grip, and his hand was still on the trigger, and everything. I took him to my cousin's place and woke them up, and told them George tried to hold up a guy, or something, and he got shot. I said to my cousin, 'What do you think is the best

thing to do,—do you think we had better call a doctor or sheriff or what?' and he said, 'I will call for a doctor;' and he did, and I went back to the car and stayed there, and my brother died about that time. One of these fellows that came asked me what I thought about it, and I said: 'I don't think very much about it, but it seems to me that he got what was coming to him.' "

Witness stated that he had no idea that his brother was trying to hold anybody up; that he never knew Otto Mitchell until after the occurrence; that he took his brother on the ride simply because his brother said, "Let's go and take a ride;" that he wanted to please his brother because he would only be with him a few days; that his brother said that night that maybe he would go the next day or the day afterward; that his brother did not say where he was going, and that he did not know where his brother lived; that he was with his brother practically every night while his brother was in Sioux City; that his brother would meet him when he quit work; that he never knew where his brother stayed; that he asked him where he was stopping, and his brother said, "That's all right;" that his brother would tell him nothing; that, the night of the tragedy, he and his brother played pool until it was late; that, because his brother wanted him to, he drove him out on the Correctionville road, pretty nearly to Moville, and turned around and came back a distance of about two miles, then stopped his car because his brother said he wanted to urinate; that he stopped the car and turned off the lights because his brother told him to; that he did not see his brother place a handkerchief over his face; that he did not have one over his face when he picked him up; that he may have had one around his neck, but he did not see it; that he was sitting in his car behind the steering wheel all the time until after the shooting; that he could see the truck coming up the hill, but did not pay any attention to it; that the truck was going the opposite direction from his car; that his brother had been out of the car for a minute or two when he looked back and saw him running after the car; that he couldn't see whether his brother had a gun in his hand or a handkerchief over his face or not;

that he did not stop his car at that place, at the top of the hill, having in mind that cars would have to be going slowly at the top of the hill; that there is a little curve there at the top of the hill, and that he couldn't watch in detail what his brother did; that:

"I seen him grab hold of the truck there,—that is all I could see; and I was sitting behind the wheel in my car. I heard the shooting and heard someone holler, and saw the truck go on. I got out of my car and went down there, as soon as I heard them holler. My brother was there, with a gun in his hand. There was no shell in it that I remember of, for the constable and I opened it together, when it was lying there on my brother. I don't know just how I got my car to my brother. I think I kind of run it in that draw, and then backed around. I was on the outside of the draw, away from town."

He said that he picked his brother up and put him in the car in the back seat; that, when he got to his cousin Stickley's place, he told Stickley that there was a holdup, and that George got shot; that Stickley phoned for a doctor. Witness testified that, on the night that his brother was killed, his brother had a half-pint bottle of liquor, and that he, witness, had a drink or two; that he did not know whether his brother had any money or not; that, on the day his brother came to Sioux City, about a week before, he paid his brother $20 which he was owing him. Witness stated that he, himself, had about a dollar on his person when he was arrested, and that was all the money he had anywhere; that his wife had a little money,—he didn't know how much; that, when he received checks for his work, he gave them to his wife; that he did not think his wife had any money in the bank, for they had recently bought a Ford; that, on the night in question, his brother had about $5 on his person.

III.   We have set forth all the material evidence.

As a witness for himself, appellant admitted practically all of the facts and circumstances presented in the State's evidence. We think the facts and circumstances shown in evidence sufficient to support a finding of the jury that appellant aided and abetted his brother in the perpetration of the crime. Appellant's own testimony, elicited on his examination in chief,

indicates that his inclination is criminal, rather than law-abiding. He had been committed to the penitentiary of South Dakota for forgery. A review of the record shows, by admissions of appellant, that he was in company with his brother when the assault on Mitchell was made; that he furnished the car to make the drive; that he was driving the car, and stopped it at a point near the top of the hill, where cars coming from Sioux City would necessarily have to slow down, and that it was near a curve, which would also necessitate the slowing down of motor vehicles as they neared the curve; that he stopped the car and turned out the lights. He says he stopped the car at his brother's request, to allow him to get out and urinate. Of course, appellant might have stopped the car, and perhaps might have turned out the lights, on account of any one of a number of reasons; but the jury might conclude by reasonable inference that the reason given for stopping the car and turning out the lights was not the true reason, in view of the facts and circumstances surrounding the whole affair. The jury might reasonably infer from the facts and circumstances that these two men were engaged in a joint enterprise, and had in mind, when the attack was made upon Mitchell, to rob any person who might come along the road at the place where the car was stopped and the lights extinguished. Under all the facts and circumstances, we think the jury was warranted in not believing the explanation made by appellant, that he did not know that his brother went out on this ride with the purpose in mind of robbery. The jury might reasonably discard appellant's story as untrue, that he went out on a pleasure ride with his brother at a midnight hour with no criminal purpose in mind, especially in view of what did happen. We think the verdict finds sufficient support in the evidence to sustain it.

IV. Complaint is made of the instruction given by the trial court on circumstantial evidence. The particular complaint is that, in the instruction, the court failed to tell the jury that each circumstance should be proved beyond a reasonable doubt, or by clear and satisfactory evidence. Also, it is contended that the instruction does not properly set forth the theory of circum-

2. CRIMINAL LAW: instructions: effect of circumstantial evidence.

stantial evidence. The criticisms are without merit. The court did specifically instruct that if, "on the consideration of the whole evidence before you, you then have no reasonable doubt, as in these instructions defined, as to the guilt of the defendant, you should convict him; but if you then entertain such doubt, you should acquit him, and so return your verdict."

In another instruction the court fully and correctly defined "reasonable doubt." Counsel fails to point out in just what particulars the instruction on circumstantial evidence as given falls short of the requirements. The instruction correctly tells the jury that the State can prove this case by circumstantial evidence, as well as by both direct and circumstantial evidence; and, substantially, that, in order to warrant conviction on circumstantial evidence, the circumstances, taken together, should be of a conclusive nature and tendency, leading, on the whole, to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty that the accused committed the offense charged. No instruction was requested.

V. Appellant was present at the time and place of the commission of the crime charged. If he was there by prearrangement with his brother, and either actually aided in its commission or was there with that purpose in mind, to the knowledge of his brother, he was guilty as a principal, although he did not actually participate in the assault. 16 Corpus Juris 133; *State v. Nash,* 7 Iowa 347; *State v. Maloy,* 44 Iowa 104. The presence of appellant at the time and place of the commission of the crime, his companionship with his brother, and his conduct before and after the crime, are circumstances from which his participation may be inferred. *State v. Maloy,* supra; *State v. Davis,* 191 Iowa 720; 16 Corpus Juris 133.

3. CRIMINAL LAW: accessories: aiding and abetting.

A person who is actually present at the time and place of a crime, and who either actually aids, abets, assists, or advises its commission, or is there with that purpose in mind, to the knowledge of the person actually committing the crime, is guilty as principal, although he did not himself accomplish the purpose. Code Section 5299; *State v. Dunn,* 116 Iowa 219; *State v. Berger,* 121 Iowa 581; *State v. Davis,* supra.

VI. The jury, in weighing the testimony of appellant as a witness for himself, might properly consider his interest in the result of the case, the manner of testifying, the reasonableness of his account of the transaction, and whether made in good faith, as affecting his credibility. The jury evidently did not believe the story of appellant, explaining why he was present and his connection with the occurrence. In view of the uncontradicted testimony in this case, we think a case was made out to go to the jury, and that it was for the jury to determine whether or not appellant was guilty as a principal by aiding and abetting.

We find no reason for disturbing the verdict and judgment of the court. Results in affirmance.—*Affirmed.*

STEVENS, DE GRAFF, and VERMILION, JJ., concur.