[Crim. No. 4109. In Bank.—September 20, 1937.]

## THE PEOPLE, Respondent, v. FRANK WILHELM, Appellant.

Stanley Visel for Appellant.

U. S. Webb, Attorney-General, and Paul D. McCormick, Deputy Attorney-General, for Respondent.

THE COURT.—This is an automatic appeal under Penal Code, section 1239, after conviction upon the charge of murder in the first degree, and the imposition of the death penalty. Defendant was also charged in a second count with having committed a robbery upon the same victim on the same date. This count was later dismissed.

After the entry of the plea of guilty the trial court took evidence to determine the degree of the crime, and among

other things, the transcript of the preliminary examination of defendant was received in evidence by stipulation, to be used by the court in arriving at its decision.

The only contention of defendant upon this appeal is that the court was not justified in holding the crime to be murder in the first degree, with the death penalty pronounced thereon.

It appeared that the deceased, Jesus A. Tomaya, a Filipino, employed as a servant in a private home, met his death on November 23, 1936, in an apartment house located at 240 South Figueroa Street, in the city of Los Angeles. On this day deceased left his place of employment at about 11.30 A. M., it being his day off. He was wearing a diamond ring and also had on his person a watch and chain and another ring. His employer testified that she gave him a five dollar bill before he left. He proceeded to the apartment house above mentioned, whereat defendant was living with two other Filipinos named Emilio Ramos and Francisco de la Cruz, respectively. Defendant was a half-breed Filipino. The apartment was located on the ground floor of the building and consisted of a living room with a folding bed and a couch, a bathroom and kitchen. When deceased arrived at the apartment defendant and de la Cruz were still in bed. Defendant thereupon admitted deceased to the apartment and began dressing himself. Ramos, the other room-mate of defendant had left very early in the morning to go to his work and consequently was not present when deceased arrived. De la Cruz awakened about 11:30 or thereabouts and found Tomaya and defendant engaged in a friendly conversation. De la Cruz had not met Tomaya before and soon after awakening, he dressed and left the apartment. He testified that he heard Tomaya talking about either his diamond ring or another ring he had on as costing some $85, and that during the conversation between Tomaya and defendant they were smiling and very friendly toward one another; that when he left they were talking about going to a show. It appeared that about 3 P. M., on the same day defendant came out of the apartment and stated to the manager, "If anyone calls me, tell them I don't live here any more." After leaving the apartment house defendant pawned a diamond ring and received $10 for it. Ramos returned to the apartment about

8 o'clock P. M., on the evening of the same day and upon entering he was attracted by the sight of blood in the middle of the living room floor. He then noticed defendant's suit-case was missing from the closet and thereupon discovered the body of deceased on the floor of the closet. The hands and feet were tied and there was a string around his head. The body was covered with towels full of blood, and the head was considerably swollen. The cords used to tie the hands and feet came from the bathrobes belonging to defendant and Ramos, respectively. A rolling-pin wrapped in a bloody towel was found in a cupboard drawer in the kitchen. No money or jewelry was found on the body of the deceased.

About a week later defendant was apprehended in San Francisco where he had gone the day of the death of deceased, and where he pawned some of the other jewelry taken from the body of deceased. He stated to police officers that on the occasion of Tomaya's visit deceased had become angry when defendant had refused to agree to get some girls for them, for immoral purposes, and that he (deceased) struck at defendant with a hair brush; that defendant struck deceased with his hands a couple of times and that deceased got up and struck at him again, putting his hand in his pocket, that defendant thought the deceased was going to go for a knife or a gun, and he struck him again and knocked him unconscious; that thereupon he became worried for fear the deceased or some of his gang might "get him" when the deceased recovered his consciousness, so he, defendant, crawled to the kitchen and took a rolling-pin which was on a chair and hit deceased over the head. He stated that he did not know deceased was dead; that he was still breathing when he leaned over him; that he took the watch, two rings, and a cigarette case but no money; that he admitted pawning the diamond ring and the watch. He stated that he lost the other ring and gave the cigarette case to somebody because it had deceased's initials on it and he "knew it was hot"; that he took these articles because he had no money to get away from Los Angeles. At the hearing to determine the degree of the crime, a police officer testified that he had made an investigation of the crime and had had a conversation with the defendant; that the latter told him deceased was not armed at the time of the fight; he also testified that deceased had the smell of wine on his breath when he came to the

apartment, but that he was not intoxicated; that deceased brought a pint of wine with him and that they had a couple of drinks in the kitchen. Defendant stated that he had no idea of stealing anything from deceased prior to the time he hit him with the rolling-pin. Deceased's face was considerably swollen and he suffered the following injuries; contusions and lacerations on his head and face; a fracture of the lower jaw bone; two hemorrhages on his head inside the scalp, one on either side; a large subdural hemorrhage over the brain, and two skull fractures.

Defendant contends malice was not shown in that as there were no eye-witnesses and only the word of the defendant as to what took place, that such evidence negatives either express or implied malice. He contends that under the evidence it was incumbent upon the trial judge to have found the degree of the crime to have been manslaughter where, as here, the killing, though unlawful, is "without malice". In view of the facts in this case shown by the testimony reviewed hereinabove, which showed the deceased's trussed-up body in the closet, the presence of blood in various places in the apartment, the rolling-pin in the bloody towel, the undisturbed condition of the furniture and furnishings in the room, the nature of the blows which must have fallen upon deceased's head to produce the swollen condition, hemorrhages and fractures testified to, together with the further fact that nobody in the apartment house heard any noise emanating from the apartment of defendant during the time it was shown he and deceased were there together, which might have suggested a fight, although someone was at the desk in the apartment house all day, on the same floor, three doors down the hall, it cannot be said that premeditation was not shown when these circumstances are considered together with defendant's statement that he had hit deceased with the rolling-pin after the deceased was unconscious. It is said in the case of *People* v. *Erno*, 195 Cal. 272 [232 Pac. 710], that premeditation may be inferred from proof of such facts and circumstances in the case as would reasonably warrant an inference of its existence. Such facts are apparent in this case.

Defendant claims that the evidence was not sufficient to justify the trial judge in inferring that the facts above related tended to negative the existence of a fight in the room, but the inferences drawn by the trial judge therefrom were not

only based on sufficient evidence but were reasonable and fair in view of all the facts and circumstances above related.

No error being shown in the record, the judgment must be and hereby is affirmed.