STATE of Iowa, Appellee,

v.

Dennis C. LASS, Appellant.

No. 56960.

Supreme Court of Iowa.

April 16, 1975.

Rehearing Denied May 16, 1975.

John B. Grier and John F. Veldey, Marshalltown, for appellant.

Richard C. Turner, Atty. Gen., Raymond W. Sullins and Thomas D. McGrane, Asst. Attys. Gen., and Ronald M. Kayser, Marshall County Atty., for appellee.

Lawrence F. Scalise, Des Moines, amicus curiae.

Heard before MOORE, C. J., and RAWLINGS, UHLENHOPP, REYNOLDSON and HARRIS, JJ.

UHLENHOPP, Justice.

This appeal involves several questions which arose in a prosecution on a murder charge.

We view the evidence in the light most favorable to the verdict of first-degree murder. State v. Blyth, 226 N.W.2d 250 (Iowa). The jury could find the facts to be as follows.

Defendant Dennis C. Lass, born in 1940, finished high school, successfully completed a tour of duty in the armed forces, worked at various jobs, and enjoyed several hobbies. In 1964 he started courting Rochelle D. Mickelson, a trained nurse four years his junior, and they married in 1966. In 1968 he began a career as an insurance claims adjuster, based in Marshalltown, Iowa. While defendant as a witness at trial repeatedly stated that his wife was a good woman and he loved her, he also testified that she was a poor housekeeper and quarrelsome when corrected, and that she used abusive language on those occasions. He testified that he tended not to answer back. Aside from those incidents, defendant and his wife seemed to enjoy a fairly happy and normal married life. They had a 14-month-old child at the time of the wife's death and a nice home in Marshalltown.

Sometime prior to 1973, defendant developed a relationship with a married neighbor woman. They saw each other at various places and had sexual intercourse. The relationship was serious, but defendant and the woman agreed that nothing could come of it because they both had families. Defendant stated to a business associate that the woman had a child by defendant. Defendant testified the relationship "went on this way for a couple of years and it just kept building and building." Defendant saw the woman down to the time of Mrs. Lass's death and, indeed, thereafter.

On the morning of February 22, 1973, defendant did not eat breakfast, went to his office, but returned before noon. He did not eat lunch. That afternoon Mrs. Lass went out, leaving the child with a sitter, LaVonne Sievers. Defendant testified he worked in the garage at his taxidermy hobby. He also took his car to a service station for a tuneup and left it there. He returned with a borrowed car, which he parked in front of the house.

Later in the afternoon, defendant dismissed the baby sitter. He testified he intended to take his wife to dinner at Shady Oaks that evening—although Shady Oaks was closed during January and February and had been closed during those months for a number of years.

Mrs. Lass eventually returned with her car, leaving it out. Defendant put that car in the garage; he backed it in. He testified he did so to unload some shotgun shells from it and to put on new license plates.

That evening defendant and Mrs. Lass prepared to go to dinner. Another baby sitter arrived, Gerene Ann Sievers. Just before seven o'clock, defendant drank some homemade wine and Mrs. Lass drank a small amount. They also ate shrimp cocktail. The stereo was playing. The baby sitter testified that defendant "went in and turned it up and Rochelle said, 'Denny turn that down,' and he said, 'No, Gerene's used to loud music.' It was louder than I had ever heard it there before."

Customarily, Mrs. Lass left the house through the front door. On this occasion she started for that door but defendant said, "No, let's go out this way"—the side door to the garage. The baby sitter testified:

As soon as the door shut, I heard Rochelle start screaming. It was a real frightening scream and I wanted to hear what was happening, but I couldn't because the stereo was too loud. I went upstairs through the kitchen and went into the living room where the stereo was located. When I pulled the phono arm

off the stereo, I was able to hear better. The screaming continued until it just got more frightening and terrifying and then I heard a lot of noises—glass breaking and things being thrown and shuffling of feet. Mrs. Lass was yelling, "No." I did not hear Denny Lass's voice. The screaming lasted for about four or five minutes. Right at the end she was screaming and then it was muffled like somebody had their hand over her mouth and then there wasn't any screaming.

. . .

When the screaming stopped, the back door that leads into the garage opened and Denny said, "Gerene." I said, "Yes." "We'll be back in about an hour," and I said, "Denny, what happened out there?" and he said "I scared Rochelle with a bird." When we began talking, I started to walk back to the door that Denny had opened and then he closed it. I went back to the front door and I observed Denny driving out of the garage. The car was going out frontwards. The only person I saw in the car was Denny.

Subsequent examination of the garage revealed a pool of blood covered by a shirt, an antique flatiron, a brick with hair and blood on it, one of Mrs. Lass's shoes, and her eyeglasses.

Defendant drove around for awhile. He went to a rural river bridge in adjoining Tama County. We will later quote an officer's testimony about an investigation at the bridge. Defendant then drove to the rural home of Arlo Hindgardner. He asked Hindgardner to call the authorities. He was wet, appeared confused and "shook up," and cried at times. He smelled of alcohol, but a later blood test was negative.

At Hindgardner's home, defendant told a story that two large men in his garage hit his wife in the head with a pipe and drove off with defendant and his wife, and that defendant escaped by jumping into the river. Defendant also told a story that someone chased him in a car and stopped him near the bridge, and that he got out and fell through the ice trying to cross the river. Defendant had scratches on his head, neck, and arm. He had blood on his shirt. He said his wife was in the car.

Hindgardner and others examined the car. The windshield was broken and there was much blood on the inside including the ceiling. Mrs. Lass's body was on the right front seat and floor. She was dead. Her face was mutilated beyond recognition. She had a compound fracture between the eyes where the skull was caved in, a fracture of the upper jaw, loose teeth, four fractures of the left side of the skull, a small hole through the top of the skull, and a hole in the back of the neck.

Officers closed off the area of the river bridge and investigated it. They found the imprints of four tire marks where a car had stopped. Just back of one set of imprints they saw drops of blood. From there they saw blood drops down the road and an occasional heel print. One of the officers testified:

I had no difficulty in following this trail. It led to the Iowa River bridge. We found blood drops on the Iowa River bridge. We observed drops of blood on the deck of the bridge itself. The surface of the bridge is concrete. The blood was located clear across the bridge and on the bridge railing. We followed the trail of blood on the bridge. It went on to the south end of the bridge and appeared to pause there. There were several drops there, which would indicate somebody had stopped on the bridge. Also, over the railing and on the steel girders it appeared that the girders were all clean and then there was dirt and stuff that appeared to have rubbed off from someone's shoe or something. We couldn't pick up the blood trail any further in this location.

You could see down the river, where somebody had crawled out onto the river bank. We subsequently found tracks on the other side of the bridge and they came from the river. I followed these

tracks down into the river. They came out of the river and up on the bank into the kind of light timber area. They turned more or less back west and came up to the southwest end of the bridge and up the steep incline onto the gravel road. The tracks came out approximately 100 feet down from the bridge. We could see blood in the snow near these tracks. There was brush but nothing real heavy. We were able to distinguish the blood trail from the one that had come to the bridge from the opposite direction. The other blood trail led back towards to where we thought the vehicle had been parked.

At trial, defendant testified he remembered that he entered the garage with his wife and that she swore and uttered an obscenity toward him. He testified that from then on he remembered little, although he did remember holding a flatiron, something about having a robe, speaking to the baby sitter, driving, being at the bridge, and going to Hindgardner's house. He testified that he assumed he killed his wife and also that his story about the two large men beating his wife was untrue.

The next day, February 23, 1973, a police officer charged defendant in Marshalltown Municipal Court with murder. Defendant appeared before that court, which fixed bail.

A preliminary examination was set and continued, but on March 16, 1973, the county attorney filed his information in district court charging defendant with murder and the preliminary examination was not held. The minutes of testimony attached to the county attorney's information set out the claimed facts and circumstances in considerable detail.

On March 21, the district court reduced defendant's bail, and defendant posted bond and obtained release from custody. Also on that date, defendant pleaded not guilty. Later he gave notice of the defense of insanity. See Code 1973, § 777.18.

Thereafter the parties made various motions and filed other papers in the case, and the district court held hearings and made rulings.

Trial commenced on September 25, 1973. In his opening statement, defense counsel told the jury, among other things:

And then you're going to hear evidence about the defendant as well as about Rochelle Lass, things that aren't pleasant to disclose, things that you should know, however, things such as a relationship by the defendant with other women during this marriage. And, these are all things that you must know that cannot be hidden from you because the defense in this matter is the truth.

Both sides vigorously tried the case throughout the lengthy trial. On the issue of sanity, two psychiatrists testified. Their opinions conflicted. In addition, lay witnesses testified as to defendant's conduct bearing on sanity. On October 16, 1973, the jury found defendant guilty of first-degree murder.

After ruling on post-verdict motions, the trial court passed sentence. Defendant appealed.

In this court, defendant presents 14 contentions. We consider them seriatim.

■ I. *Failure to Hold Preliminary Examination.* Defendant's first contention involves questions of whether, on a county attorney's information without a preliminary examination, an accused may lawfully (1) *be restrained pending trial* and (2) *be convicted upon trial.* This case does not actually present the first question, however, as defendant is not being restrained pending trial; he has been convicted. The United States Supreme Court made this point clear in Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54. This case presents the second question: the validity of a conviction on a prosecutor's information without a preliminary examination. In Gerstein the Court also made clear that such a conviction is valid.

Gerstein was a class action brought by prisoners awaiting trial, challenging Florida procedure which permitted authorities to hold and try an accused on a prosecutor's information without a probable cause hearing before a judicial officer. During pendency of the class action the prisoners were convicted on the informations, but the United States Supreme Court nevertheless held that the action was not moot as to unnamed members of the class. The Court unanimously held that a probable cause determination is a condition to any significant pretrial restraint on liberty but that an accused is not entitled to judicial oversight of the decision to prosecute nor is he entitled to have a conviction voided for lack of a probable cause determination. The Court stated:

> In holding that the prosecutor's assessment of probable cause is not sufficient alone to justify restraint on liberty pending trial, we do not imply that the accused is entitled to judicial oversight or review of the decision to prosecute. Instead, we adhere to the Court's prior holding that a judicial hearing is not prerequisite to prosecution by information. Beck v. Washington, 369 U.S. 541, 545, 82 S.Ct. 955, 957, 8 L.Ed.2d 98 (1962); Lem Woon v. Oregon, 229 U.S. 586, 33 S.Ct. 783, 57 L.Ed. 1340 (1913). Nor do we retreat from the established rule that illegal arrest or detention does not void a subsequent conviction. Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). Thus, as the Court of Appeals noted below, although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause. 483 F.2d 778, at 786–787. Compare Scarbrough v. Dutton, 393 F.2d 6 (CA 5 1968), with Brown v. Fauntleroy, 143 U.S.App.D.C. 116, 442 F.2d 838 (1971), and Cooley v. Stone, 134 U.S.App.D.C.

317, 414 F.2d 1213 (1969). 420 U.S. 118, 95 S.Ct. 865, 43 L.Ed.2d 68.

See also Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232; Blue v. United States, 119 U.S.App.D.C. 315, 342 F.2d 894; Carroll v. Turner, 262 F.Supp. 486 (E.D.N.C.); State v. Franklin, 163 N.W.2d 437 (Iowa); Engstrom v. Naauao, 51 Haw. 318, 459 P.2d 376; Weddle v. State, 4 Md.App. 85, 241 A.2d 414.

We do not find merit in defendant's first contention.

■ II. *Witnesses Before County Attorney.* Sections 769.19, 769.20, and 769.21 of the Code provide that the clerk of court shall issue subpoenas directing the appearance of witnesses before the county attorney, who may administer oaths. Section 771.17 provides that indictments may be found only upon testimony of witnesses examined before the grand jury, documentary evidence, or minutes of witnesses' evidence given before the committing magistrate. Section 769.13 provides that all provisions of law which apply to prosecutions on indictments apply to county attorney informations "as nearly as may be". Defendant argues that under these statutes, county attorney informations must be founded upon testimony of witnesses examined under oath.

Chapter 769 itself, which authorizes county attorney informations, does not purport to require that such an information be founded on evidence of witnesses given before the county attorney. Section 769.7 requires verification of the information by that official and § 769.8 requires approval of the information by a judge before it may be filed—steps not required with an indictment. Indeed, §§ 769.19, 769.20, and 769.21, on which defendant relies, did not come into existence until 1924, several years after the 1911 enactment of § 769.1 (authorizing informations) and § 769.13 (making indictment provisions applicable to informations). 34 G.A. ch. 188, §§ 1, 9; 40 Ex. G.A.H.F. 134, §§ 6, 7, 8.

Close examination of other statutes reveals the statute on informations does not contemplate that witnesses must testify before the county attorney. Thus § 772.3 provides that when an indictment is found, the names of all witnesses "on whose evidence it is found" must be endorsed upon it, whereas § 769.4 provides that when the county attorney files his information, he shall endorse upon it the names of the witnesses "whose evidence he expects to introduce. . . . " Again, § 776.1(3) provides that the court shall on motion set an indictment aside when "the minutes of the evidence of the witnesses examined before the grand jury" are not returned therewith, whereas corresponding § 769.17(2) provides for setting aside an information when "the minutes of evidence" are not filed therewith.

We hold that the law does not require county attorney informations to be founded on testimony of witnesses examined under oath.

III. *Bill of Particulars.* Among the various pretrial papers which defendant filed was an unusual bill of particulars requesting numerous items of what for the most part must be called evidence, such as a "complete list of all items, material, documents, fingerprints, samples and scrapings taken from the residence . . . specifically stating the location of said item, material, etc. within the house when first discovered. . . . A list of all clothes, jewelry and other items found or in the possession of the State of Iowa or law enforcement agencies which are claimed belonged to or were in the possession of Rochelle D. Lass on February 22, 1973, and as to each such item, describe where and when it was discovered, by whom, the date and time taken into the custody of Plaintiff or law enforcement officers and by whom. . . . Whether it is claimed there was any motive for the alleged murder of Rochelle D. Lass and if so, set out in detail the nature of said motive . . . .. All statements, allegedly made by Defendant to law enforcement officers or third persons known to the Plain-

tiff, concerning the crime charged in the Information. . . . All statements, whether transcribed or not, given to investigative officers by Gerene Ann Sievers . . . .," and numerous other items. In paragraph 2, however, the bill requested the State to state the means by which the alleged murder was accomplished.

Initially we thought defendant misnamed the bill of particulars and had in mind a motion to produce. Upon examination of the transcript and file, however, we found that defendant also filed a motion to produce and a motion for exculpatory evidence. In the motion to produce, defendant requested production of a number of items and in the motion for exculpatory evidence he requested production of all exculpatory material.

On April 16, 1973, the trial court held a lengthy hearing on the three motions. The county attorney denied knowledge of exculpatory material, no such material appears, and we need consider that motion no further. In ruling on the other two motions, the trial court commented that many of the questions in the motion for a bill of particulars were covered by the motion to produce and sustained all parts of the latter motion except the last paragraph, which asked for defendant's own fingerprints. As to the motion for a bill of particulars, the court stated:

> The Court has considered the allegations of the County Attorney's information with the minutes of testimony attached thereto and is of the opinion that it fully and fairly apprises the defendant of the details of the offense charged against him, except, perhaps, as to the means by which the murder was accomplished [paragraph 2 of the motion].

The court therefore overruled the motion except for paragraph 2, which it sustained.

Defendant now asserts regarding the motion for bill of particulars that the trial court should have required the State to set out defendant's motive, all statements by

defendant to law officers or third persons, and all statements given to investigators by Gerene Ann Sievers. We review the trial court's ruling on the motion as the matter stood when presented on April 16 and ruled upon on April 20, 1973.

At that time the trial court had before it a county attorney's information which contained minutes setting out the claimed facts in more than usual detail. Prior to the Short Form of Indictment Act, an indictment or information had to allege the offense charged in extenso. That Act now permits the State to charge the offense in very brief terms. 43 G.A. ch. 266, now Code 1973, § 773.2 et seq. Section 773.4 provides that an indictment is valid if it charges the offense by using the statutory name of the crime or by stating so much of the definition of the crime as gives notice of the offense. With this short form of charge the legislature instituted the bill of particulars for appropriate cases. State v. Engler, 217 Iowa 138, 251 N.W. 88; Perkins, Short Indictment Act, 14 Iowa L.Rev. 385, 395-398 (rationale of the Act).

■ The principal object of an indictment or information is "to apprise defendant of the crime charged." State v. Grimm, 240 Iowa 471, 478, 35 N.W.2d 647, 651. A bill of particulars "in legal effect is a more specific statement of the details of the offense charged." State v. Harness, 214 Iowa 160, 162, 238 N.W. 430, 431. "The office of a bill of particulars in criminal prosecutions is to give the adverse party information which the pleadings by reason of their generality do not give. . . . In criminal prosecutions a bill of particulars ordinarily may be allowed in the discretion of the trial court where the charges of the indictment are so general in their nature that they do not fully advise the accused of the specific acts with which he is charged." 42 C.J.S. Indictments and Informations § 156 at 1092-1093. Iowa courts, in passing on the adequacy of the allegations to apprise the accused, consider also the minutes attached to the indictment or information. Code 1973, § 773.6. An accused does not have an absolute right to a bill of particulars in all cases, State v. Powers, 239 Iowa 430, 30 N.W.2d 476, and trial courts have discretion in determining the adequacy of an indictment or information in the light of the minutes attached. State v. Shephard, 255 Iowa 1218, 124 N.W.2d 712. See also Truck Drivers' Local No. 421 v. United States, 128 F.2d 227 (8 Cir.); Pines v. United States, 123 F.2d 825 (8 Cir.); Hass v. United States, 93 F.2d 427 (8 Cir.); Bedell v. United States, 78 F.2d 358 (8 Cir.).

■ The motion for a bill of particulars comes at the pleading stage and cannot be used as a device to obtain the prosecutor's evidence or theory of the case or unessential allegations. Kempe v. United States, 151 F.2d 680 (8 Cir.); United States v. Luros, 243 F.Supp. 160 (N.D.Iowa), cert. den. 382 U.S. 956, 86 S.Ct. 433, 15 L.Ed.2d 361; 4 Wharton, Criminal Law & Procedure, § 1867 at 721-723 (Anderson ed.); 41 Am.Jur.2d Indictments & Informations § 168 at 985. See State v. Davis, 196 N.W.2d 885 (Iowa).

■ Defendant misconceived the function of a bill of particulars, and the trial court limited the motion to its proper sphere. Since motive is not an essential allegation, a prosecutor is not required to allege it in the information, People v. Wagner, 390 Ill. 384, 61 N.E.2d 354, nor prove it on trial. State v. Kneeskern, 203 Iowa 929, 943, 210 N.W. 465, 471 ("Proof of motive is not necessary."). See also State v. Stevens, 93 Idaho 48, 454 P.2d 945. If defendant desired to inspect statements of witnesses or others, he should have included them in his motion to produce and complied with State v. Eads, 166 N.W.2d 766 (Iowa). We hold that the trial court acted within its discretion in ruling that the information was sufficient. See State v. Shephard, 255 Iowa 1218, 124 N.W.2d 712.

IV. *Instruction on First-Degree Murder.* Defendant objects to the following sentence in the trial court's instruction on the element of "willful, deliberate, and premeditated" killing in first-degree murder:

If a person with opportunity to deliberate makes a wrongful assault upon another with a deadly weapon and death ensues, the inference is warranted that he did so with malice, deliberation, premeditation and a specific intent to kill in the absence of evidence to the contrary.

Defendant contends that the sentence violates the rule that the use of a deadly weapon does not of itself raise a presumption of willful, deliberate, premeditated killing. State v. Wilson, 234 Iowa 60, 11 N.W.2d 737; State v. Phillips, 118 Iowa 660, 92 N.W. 876.

■ The court did not instruct, however, that use of a deadly weapon "raises" a "presumption" but rather that it "warrants" an "inference." Moreover, the court did not instruct that the use of a deadly weapon, of itself, warrants the inference. The court added the factor, "with opportunity to deliberate." Our cases hold that use of a deadly weapon with opportunity to deliberate constitutes "evidence of malice, deliberation, premeditation, and intent to kill." State v. Hall, 214 N.W.2d 205, 211 (Iowa); State v. Gilroy, 199 N.W.2d 63 (Iowa).

■ Deliberation, premeditation, and intent to kill, being mental conditions, must ordinarily be inferred from external circumstances. 40 C.J.S. Homicide § 192 at 1091 ("[they] may be inferred from the circumstances of the killing"). The trial court permitted the jury to infer. This is what we actually do when we tell the jury that use of a deadly weapon with opportunity to deliberate "constitutes evidence," for the jury can only reach the conclusion of premeditation from such evidence by inferring. See State v. Heinz, 223 Iowa 1241, 275 N.W. 10. Compare use of the expression, "warranting an inference," in People v. Wilhelm, 9 Cal.2d 567, 71 P.2d 815; People v. Dale, 7 Cal.2d 156, 59 P.2d 1014; People v. Bellon, 180 Cal. 706, 182 P. 420; People v. Mahatch, 148 Cal. 200, 82 P. 779; and Commonwealth v. Heller, 369 Pa. 457, 87 A.2d 287.

We find no error here.

V. *Burden of Proof.* Defendant objects to instructions which he says placed the burden of proof on him.

■ We consider the challenged instructions in the context of the other instructions bearing on the burden of proof. State v. Buchanan, 207 N.W.2d 784 (Iowa). These other instructions were Instruction 2, which told the jury that defendant's not-guilty plea placed the burden of proof on the State to prove the allegations of the information beyond a reasonable doubt; Instruction 3, which stated that defendant was presumed innocent, that the presumption must prevail unless the evidence established guilt beyond a reasonable doubt, and that such doubt may arise from the evidence "or it may arise from the lack or failure of evidence produced by the State"; and Instruction 9 on venue, Instruction 10 on corpus delicti, Instruction 14 on sanity, Instruction 15 on the two elements of sanity, Instruction 17 on willful, deliberate, and premeditated killing, Instruction 18 on malice aforethought, and Instruction 19 on unlawful, felonious killing without malice aforethought—each of which stated that the State had to prove the particular element beyond a reasonable doubt. Instruction 23 told the jury they could not convict defendant of any offense of which they had reasonable doubt.

In this assignment of error defendant objects in particular to the court's instruction on circumstantial evidence. The situation here is very similar to State v. Johnson, 198 Iowa 588, 199 N.W. 316. This is true as to both the existence of other instructions placing the burden on the State to establish the elements beyond a reasonable doubt and the language of the circumstantial evidence instruction itself. This court found no error in that case, and we are unable to draw a meaningful distinction between that case and the present one.

■ Defendant also objects to the trial court's instructions which dealt with the inference the jury may draw from the use

of a deadly weapon. In addition to the quotation we have made, the court stated in those instructions that the inference is not conclusive and may be considered with all the evidence or lack of evidence in the case, in determining whether the necessary intent existed.

Defendant contends that the court should have used the words lack or absence of evidence "by the State," but we do not believe the jury could have understood that defendant had any burden of proof. In the reasonable doubt instruction this very point was made clear and the other instructions on the elements of criminal homicide expressly placed the burden on the State on every element. The court did not use the language held nocuous in State v. Hansen, 203 N.W.2d 216, 218 (Iowa). See State v. Fischer, 245 Iowa 170, 172–173, 60 N.W.2d 105, 106 ("But we have many times said assault with a deadly weapon implies malice; and if death ensues the presumption is warranted that such killing was with malice aforethought, *unless there be an explanation to the contrary showing a legal excuse for the assault and killing*"—italics added); State v. Crutcher, 231 Iowa 418, 423, 1 N.W.2d 195, 198 ("Instruction 12 stated that where one person assaults another with a deadly weapon and death ensues, the law presumes malice *in the absence of proof, either direct or implied, to the contrary.* This is said to be erroneous because a defendant is not required to prove the absence of malice. The instruction, however, placed no burden of proof upon appellant"—italics added); Yee Hem v. United States, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904; United States v. Martin, 459 F.2d 1009 (9 Cir.); McAbee v. United States, 434 F.2d 361 (9 Cir.); Jackson v. United States, 330 F.2d 679 (8 Cir.); People v. Cornett, 93 Cal. App.2d 744, 209 P.2d 647; State v. Anstine, 91 Idaho 169, 173, 418 P.2d 210, 214 ("Assignment No. 9, directed to Instruction No. 30, to the effect that when the evidence shows a person has assailed another violently with a dangerous weapon likely to kill, such evidence gives rise to a presumption

the assailant intended death, *but that such presumption may be overcome by contrary evidence.* Appellant contends that this required her to produce evidence for the purpose of creating a reasonable doubt. We do not agree with this contention"—italics added); Webb v. State, 520 P.2d 825 (Okl. Cr.); 40 Am.Jur.2d Homicide § 265 at 529 ("The presumption arising from use of a deadly weapon is not one of law, but is a presumption of fact, or a prima facie inference, *which can be rebutted by testimony to the contrary*"—italics added).

We do not find error at this point.

VI. *Sufficiency of Evidence of First-Degree Murder.* Defendant contends that the evidence is insufficient to establish willfulness, deliberation, and premeditation for first-degree murder.

■■■■ We view the evidence in the light most favorable to the State. State v. Blyth, 226 N.W.2d 250 (Iowa). Deliberation and premeditation "need not exist for any particular period of time prior to the killing." State v. Tice, 257 Iowa 84, 89, 130 N.W.2d 678, 681. As we have held, use of a deadly weapon with opportunity to deliberate warrants an inference of deliberation and premeditation.

Upon examination of the record before us, we hold that the evidence is abundant to establish first-degree murder. See State v. Fryer, 226 N.W.2d 36 (Iowa).

■■■ VII. *Presumption of Sanity.* Defendant gave notice of insanity and introduced evidence on that issue. In Instructions 14 and 15 the trial court instructed on the subject and placed the burden on the State to prove defendant's sanity beyond a reasonable doubt.

Instruction 14 begins, "In a criminal case a person is presumed to be sane and responsible for his acts unless his sanity is put in issue. The Defendant has raised this issue and asserts that he was not sane at the time of the acts charged against him and not criminally responsible for such acts."

Defendant first asserts the court should not have stated that a person is presumed sane, as the presumption is solely for the court and not for the jury. We recently held the contrary in State v. Thomas, 219 N.W.2d 3, 5 (Iowa), quoting from Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499. We said:

But if the defendant's sanity is drawn in issue and substantial evidence appears in the record raising a fact question under the M'Naghten test—regardless of the source of that evidence—then the burden devolves upon the State to prove the defendant's sanity beyond a reasonable doubt by all the evidence in the case *including the presumption of sanity.* . As stated conversely in the Davis case regarding the jury's duty, "If the whole evidence, *including that supplied by the presumption of sanity,* does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged." 160 U.S. 488, 16 S.Ct. 358, 40 L.Ed. 506. (Italics added.)

Accord: Keys v. United States, 120 U.S. App.D.C. 343, 346 F.2d 824; State v. Daniels, 106 Ariz. 497, 478 P.2d 522; People v. English, 29 Mich.App. 36, 185 N.W.2d 139; State v. Pike, 49 N.H. 399; State v. Wilson, 85 N.M. 552, 514 P.2d 603; People v. Silver, 33 N.Y.2d 475, 354 N.Y.S.2d 915, 310 N.E.2d 520; People v. Tobin, 176 N.Y. 278, 68 N.E. 359; Brotherton v. People, 75 N.Y. 159. On submission of presumptions for jury consideration · generally, see Model Penal Code, § 1.12(5) (A.L.I.1962); Comments on Model Penal Code, § 1.13 at 114–117 (T.D. No. 4, 1955); Proposed Federal Criminal Code, Study Draft, § 103(4) and Comment pp. 23–24 (1970). See also United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658.

Actually, the trial court's instruction was more favorable to defendant than the rule in the Thomas case. The trial court did not submit the presumption to the jury for consideration, but stated only that a person is presumed sane unless sanity is put in issue and that defendant had raised the issue.

Defendant also argues that the trial court's words, "Defendant has raised this issue and asserts that he was not sane" told the jury the burden was on defendant to establish insanity. But the court's words merely stated how the issue was raised, not who had the burden of proof. The court dealt with the burden of proof in the same instruction and in the next one, and told the jury that the burden was on the State to prove defendant sane beyond a reasonable doubt.

We find no error here.

■ VIII. *Sufficiency of Evidence of Sanity.* Defendant argues that the evidence of his sanity was insufficient to generate a jury question. The testimony of defendant's psychiatrist was sufficient to raise the insanity issue. The testimony of the State's psychiatrist strongly refuted defendant's evidence; this psychiatrist's conclusion was, "There is no question in my mind that defendant was sane at the time he killed his wife." The lay testimony also supported a sanity finding. We hold that the sanity issue was clearly for the jury even without consideration of the presumption of sanity.

■ IX. *M'Naghten Rule.* Defendant objects to the trial court's submission of insanity under the M'Naghten rule and asks us to depart from that test. The court comprehensively reviewed the literature and authorities on this subject, and then retained the M'Naghten rule, in State v. Harkness, 160 N.W.2d 324 (Iowa). We will not repeat the numerous considerations which were reviewed there. The court also considered the various considerations and retained the M'Naghten rule in State v. Arthur, 160 N.W.2d 470 (Iowa). Since that time the court has applied the M'Naghten rule several times. State v. Allan, 166 N.W.2d 752 (Iowa); State v. Booth, 169 N.W.2d 869 (Iowa); State v. Carstens, 182 N.W.2d 119 (Iowa); State v. Hall, 214

N.W.2d 205 (Iowa); State v. Thomas, 219 N.W.2d 3 (Iowa). We adhere to it now.

We do not find merit in defendant's objection.

X. *Prosecutorial Misconduct.* Defendant contends he is entitled to reversal because of questions asked and statements made during trial by Mr. Ira Skinner, Jr., one of the attorneys for the State.

Early in the proceedings defendant made motions in limine, which the district court sustained. This alerted the prosecutor to the necessity of taking up such matters outside the jury's presence. State v. Wright, 203 N.W.2d 247 (Iowa). During trial Mr. Skinner asked some questions which too closely skirted the rulings on the motions or verged on too-strong language. The trial court, however, sustained proper objections by defendant except in a few instances when Mr. Skinner withdrew the questions.

We realize that the case was very vigorously tried on both sides and that matters are sometimes said in the heat of battle which would not be stated in an atmosphere of detached reflection. We also realize good arguments could be made that some of Mr. Skinner's statements or questions were proper. For example, at one point Mr. Skinner asked a witness about her knowledge of defendant's relationship with other women. Defendant objected to this, but defense counsel himself injected that subject into the trial in his opening statement and the testimony contains considerable evidence on defendant's infidelity.

Defendant also makes much of Mr. Skinner's remark that an effort was made to wipe up the blood in the garage, whereas a defense witness subsequently testified he was the one who wiped it up. Mr. Skinner was evidently trying to show that defendant attempted to conceal the blood. In that connection the evidence did reveal that a shirt was placed over the blood, and the jury could find that defendant was the one who placed it there. Thus the jury could draw the ultimate inference urged by the State—that defendant attempted to conceal the blood. The testimony and exhibits on both sides were placed before the jurors on this subject, and they could hardly have misunderstood what the evidence was regarding it. Still another item raised by defendant concerns a watch mechanism from defendant's watch, found by an officer on the floorboard of the car. But this evidence appears to be relevant and proper.

We have two problems in connection with whether the prosecutor's conduct requires another trial. One relates to the record defendant made. During reception of evidence defense counsel made objections they deemed advisable and the trial court sustained the objections which were good, but defense counsel did not ask for a mistrial. See State v. White, 225 N.W.2d 104 (Iowa); Andrews v. Struble, 178 N.W.2d 391 (Iowa).

Then at the conclusion of the evidence, defense counsel made this unusual motion: "Your Honor, at this time, the defendant would ask that the Court on its own motion *and without consent of the defendant,* declare a mistrial in this matter . . . and since the defendant is in a position where he cannot move or ask for a mistrial because of his physical, financial and emotional condition, we would ask that the Court declare a mistrial *without the consent of defendant.*" (Italics added.) The court overruled the motion. A later ruling discloses that the court did not regard this as a motion for mistrial.

We thus have this situation. The proper objections defendant made as events transpired were sustained. The defendant asked the court to declare a mistrial but defendant would not consent to a mistrial—perhaps defense counsel thought a mistrial under such circumstances would finally end the case on the ground of double jeopardy. See State v. Manning, 224 N.W.2d 232 (Iowa). In any event, after having the objections he chose to make sustained and after not consenting to a mistrial, is defendant now in a position to urge that he has a record for review? As to a proper motion

for mistrial, see 88 C.J.S. Trial § 196 at 385–387. See also 5 Am.Jur.2d Appeal & Error § 626 at 85; 4 C.J.S. Appeal and Error § 297 at 918–923.

Our other problem relates to the merits. Notwithstanding the doubtful record defendant made at trial, in connection with the post-verdict motion for new trial the trial court considered each of the items involved on its merits, and found that the items did not entitle defendant to another trial. The court stated:

The defendant lists 27 incidents which are claimed to constitute misconduct of State's counsel. Not all of these incidents involve misconduct. Since no motion for mistrial was made by defendant, the defendant now asserts that the cumulative effect of them denied defendant of a fair trial. In every case where defendant's counsel objected to the conduct of State's counsel, the Court pointed out the impropriety and admonished the jury to disregard the matter.

While the Court does not condone some of the charges of misconduct, many of them occurred inadvertently in the "heat of battle."

The Court is of the opinion that the improprieties as a whole were insufficient to poison the jurors' minds against the defendant, and that this claim is without merit.

▆▆▆▆▆ Trial courts have discretion in such matters, as they are on the scene and familiar with the trial from beginning to end. State v. Lyons, 210 N.W.2d 543 (Iowa); State v. Still, 208 N.W.2d 887 (Iowa). We have carefully considered each of the items defendant raised. We arrive at the same conclusion as the trial court. We are unwilling to hold that the trial court abused its discretion here.

XI. *Improper Argument.* Defendant urges that the prosecutor made jury arguments which have no foundation in the record.

▆▆▆ We think defendant views argument too narrowly. Counsel may urge upon the jury reasonable inferences from the evidence introduced. State v. Phillips, 226 N.W.2d 16 (Iowa).

For example, in his jury argument defense counsel took up the items of evidence one by one, endeavoring to explain why none of them showed premeditation. He threw down the gauntlet to the prosecutor. The prosecutor responded, arguing among other things that the incidents in evidence disclosed a plan to knock out Mrs. Lass and to drown her in the river, creating the appearance of an accident; but that she struggled in the garage and defendant had to strike her too hard there and killed her.

We cannot say as a matter of law this inference is or is not to be drawn from the evidence. The trial court thought and we think that this was a jury matter. The argument was based on evidence: the struggle in the garage, Mrs. Lass's cries, the extent of her injuries, the broken windshield, the results of the deputy sheriff's investigation at the river.

We have examined the State's arguments and find that they have foundation in the evidence. The trial court had discretion as to the propriety of jury arguments and found no ground for a new trial on this basis. State v. O'Kelly, 211 N.W.2d 589 (Iowa). We find no abuse of discretion.

XII. *Rebuttal Evidence.* Defendant maintains that the trial court allowed impeachment evidence regarding a collateral matter on rebuttal by the State. Defendant introduced evidence that his wife was a poor housekeeper and that he helped with housework. Defendant's psychiatrist relied on these factors, among others, in explaining defendant's mental condition and in concluding that defendant was not sane at the time of the act. On rebuttal, the State introduced evidence, over defendant's objection, that Mrs. Lass was a good housekeeper.

▆▆▆▆ Defendant's contention that this rebuttal evidence was improper impeach-

ment on a collateral matter is not meritorious. In the first place, the evidence was not introduced as impeachment but rather as substantive evidence that the facts were not as defendant's witnesses testified. That such evidence incidentally impeaches does not change its character as substantive proof. For the distinction between impeaching and contradicting evidence, see McCormick, Evidence, § 47 at 97–100 (2d ed.).

In the second place, the rebuttal evidence was not on a mere collateral matter; it dealt with one of the foundation stones for the opinion of insanity tendered by defendant's psychiatrist—a vital issue in the case. The rebuttal evidence was proper. State v. Willey, 171 N.W.2d 301 (Iowa); State v. Hephner, 161 N.W.2d 714 (Iowa).

XIII. *Jury Misconduct.* The psychiatrists disagreed as to whether defendant suffered from hypoglycemia (low blood sugar in the body). Defendant showed by jurors' affidavits that during deliberations, several jurors related personal observations of individuals experiencing hypoglycemic and diabetic attacks. Defendant contends this constituted jury misconduct requiring the trial court to overturn the verdict.

Jurors undoubtedly discuss a variety of subjects in considering cases. As a practical matter, courts cannot be too strict on jury discussions or few verdicts could stand. State v. Houston, 209 N.W.2d 42 ("a rigid approach would result in interminable litigation"). The matters which jurors bring up and discuss in the privacy of their room largely inhere in their verdict. State v. Smith, 196 Iowa 1003, 193 N.W. 418. Trial courts have broad discretion in these matters. State v. Jackson, 195 N.W.2d 687 (Iowa). The trial court here overruled this objection by defendant and acted within its discretion in so doing.

XIV. *Photographs.* The trial court admitted photographs of the autopsy in conjunction with the pathologist's testimony. They were gruesome, but so were other photographs of Mrs. Lass to which defendant did not object. Homicide cases frequently involve gruesome photographs; such litigation by its nature involves a grisly subject.

The test of admissibility of the pictures is relevancy. State v. Albers, 174 N.W.2d 649 (Iowa). Defendant pleaded not guilty and the State had to prove each element including intent to kill, willfulness, deliberation, and premeditation. The pathologist's testimony and the photographs illustrating his testimony—showing the nature, extent, and severity of the wounds—bore on the character of the assault and defendant's intent. We cannot say the trial court's conclusion of relevancy was unjustified. The court did not abuse its discretion in admitting the pictures. State v. Triplett, 248 Iowa 339, 79 N.W.2d 391; State v. Duguay, 158 Me. 61, 178 A.2d 129.

We have carefully examined the entire record and conclude that the verdict and sentence should stand.

Affirmed.

All Justices concur except RAWLINGS, J., who dissents from division I and the result.